## GLAUERT v. HUNING et al.

### No. 43477.

Supreme Court of Missouri.

Division No. 1.

March 8, 1954.

Motion for Rehearing or to Transfer
to Court en Banc Denied
April 12, 1954.

Cox, Cox & Cox, William A. Moffitt, Jr., John A. Arnold, Finley & Lucas, Ralph T. Finley, St. Louis, for appellant.

John A. Nolan, Carl V. Eimbeck, Clayton, for respondents.

COIL, Commissioner.

Plaintiff-appellant sought relief in the nature of specific performance of an oral contract to devise or convey real estate, and an accounting for rents and profits; or, in the alternative, a money judgment for services rendered. The trial court denied relief. Plaintiff appealed and initial-

ly contends that under the evidence adduced he was entitled to specific performance.

Plaintiff was the nephew of William H. and Ida K. Warmann, husband and wife, who died October 18, 1942, and December 31, 1950, respectively. Defendants-respondents, except the Hunings and William Boeckhaus, were sisters of, and are legatees in the will of, Ida K. Warmann. Huning is the executor of the estate of, a nephew of, and a legatee of, Ida K. Warmann, and is a defendant in both his individual and representative capacities. Nellie Huning is Ernst's wife and William Boeckhaus is the husband of one of the sisters. We shall refer to the parties as they were designated in the trial court.

Plaintiff's petition was unnecessarily complicated by the inclusion of evidentiary matters but, stripped of such, and of other unessential verbiage, it averred in effect: that some 30 or more years ago plaintiff began rendering services to the Warmanns under the general understanding among the parties that he (plaintiff) would be fully compensated for his services by some financial reward at the death of the survivor of Mr. and Mrs. Warmann; that by 1942 the general understanding had been made definite and certain and was this: that in consideration of past services rendered and plaintiff's promise to continue to render to the Warmanns and the survivor of them such services as they or either of them might request, they agreed that at the death of the survivor plaintiff would receive two parcels of real estate, viz., a certain farm in Warren County (sometimes referred to as the farm) and certain improved real estate on Kingsland Avenue in St. Louis County (sometimes referred to as the Kingsland property); that plaintiff fully performed but that Ida K. Warmann failed to perform.

The titles to the Kingsland (acquired about 1937) and farm (acquired in 1941) properties were held by the Warmanns in estates by the entirety. William Warmann's will, after directions as to payment of debts and nine bequests of $1 each, gave his wife $10,000 and a life estate in the residue of his estate with unrestricted power of alienation except as to the two instant properties which he devised in fee to plaintiff at Mrs. Warmann's death. He disposed of any residue remaining at Mrs. Warmann's death. There was some real estate (unidentified in the evidence) which Mr. Warmann owned individually which formed part of his estate disposed of by his will. Plaintiff was named as and acted as executor. The estate was administered and closed.

Mrs. Warmann's will (executed on April 22, 1943) and codicil (executed on April 11, 1947), after bequests of personal belongings and $100, directed that the residue of her estate be sold and that the proceeds be divided equally among the five individual defendants. Mrs. Warmann's estate remains open, the two involved properties are on hand and have a combined value of at least $30,000.

It is necessary to summarize the pertinent testimony of plaintiff's thirteen, and of defendants' five, witnesses.

Theodore Glauert, plaintiff's brother, a bricklayer and builder, testified: that Mr. Warmann acquired a brickyard in which witness worked part time until he was 21 when he began to learn the bricklaying trade; thereafter he worked for his uncle, Mr. Warmann, until 1917 and then, after leaving the army in 1919, became a journeyman bricklayer; plaintiff (usually referred to below and herein as "Gus") began to learn the bricklaying trade even before witness; Gus also worked for his Uncle Will (Mr. Warmann); during a period prior to 1921, when both plaintiff and witness were working for him, Mr. Warmann was "practically broke" and he told the witness and Gus, "I can't pay you what you are worth, but if you will stay and work with me now, Ida and I have no children, later on you will get more than you will this way. You will get it later because I appreciate the way you and Gus are helping me out"; Gus worked for Mr. Warmann in the old brickyard, while a new brickyard was being built, and worked in the new brick-

yard until it was sold about 1924; during that period Mr. Warmann paid Gus only 40¢ an hour "because he would give it to Gus later, and Gus agreed to stay with him"; the union wage at that time was $12 a day and after the new brickyard was sold, bricklayers' wages were increased.

After the brickyard was sold, and until about 1939, Gus worked for other contractors at various times when Mr. Warmann did not need him. A few months after selling the brickyard, Mr. Warmann built a home and both witness and Gus worked as bricklayers, the witness receiving $6.00 a day and Gus receiving 40¢ an hour; thereafter Mr. Warmann began a subdivision in which he built and sold about 14 houses, building two or three at a time; the witness worked intermittently on these houses and Gus worked continuously on them between about 1925 and 1929; witness did not personally know what Gus' wages were during that period; thereafter Mr. Warmann purchased "a lot of old property" and he (Mr. Warmann) and Gus repaired and improved it; in the meantime, witness had become a contractor and sometimes during 1936 and 1937 Gus worked for him, witness paying Gus $12 a day; during that period Mr. Warmann would call witness and want him to release Gus; once Mr. Warmann called witness and said, " 'I need Gus * * * Listen, don't you worry about what Gus is making. Gus will have more than any of his brothers, and it isn't only that, I know I can hire plenty of help for thirty cents an hour but' he says, 'I need Gus, it is good for me to have Gus around me' and he says, 'I want Gus' "; witness released Gus about a week after the call and worked out this arrangement, suggested by Mr. Warmann: "We will do it this way. Whenever Gus is working for me he will work for me until I let him off, then if you hire him in the meantime and he is working for you, I will wait until you let him off, then I will appreciate if I can have him if you can spare him"; thereafter Mr. Warmann and Gus built a clubhouse at Foley, Missouri, about 1937 or 1938; in 1941, "Uncle Will told me Foley was no good, he had sold it and was going

to buy a big farm with a good spring, build a seven or eight-acre lake, he and Gus were looking for places, that he was going to buy this for Gus, that he had not paid Gus, this was going to be Gus's farm after he and Aunt Ida were not here any more." Later, Mr. Warmann said: "We bought a farm for Gus and Gus and I are going to build a lake." Once in the spring of 1941, "* * * he told me he and Gus were going to buy tractors and build a lake themselves. * * * He said, 'It will be Gus's farm; you will—all the rest of you will have a place to fish,' and Ida was present at the time and nodded approval * * *." And again in 1941: "Another time he came out they had been working out there a month or so and he came and asked would I help on the lake. I told him, no, I couldn't hardly do it. He says, 'I will pay you $10.00 a day; I am paying Gus $4.00 a day,' but I explained I could not afford to do it, * * *." Mr. Warmann told witness "how he appreciated having Gus, he says, 'Gus will do anything I tell him and will come at any time I want him,' and he mentioned he—'for Gus being so faithful and good to me, I am going to take good care of Gus so that he will have nothing to worry about.' "

Referring to the Kingsland property, witness said: "On that same property he [Mr. Warmann] built a little brick store building and I saw Gus lay brick there and I also saw Gus work on a basement that they built on that same property to move the house * * * on the new basement so that he could use the front for renting out for industrial purposes." And, referring to Mr. Warmann's home, he said: "* * * the barns were remodeled. I saw Gus work carpenter work on the barns, I saw him paint up there later on. I saw him do any numerous chores. He helped trim trees up there and Uncle Will started his subdivision in there close to that. He built a street in there. I saw Gus there, worked with Gus, laid brick on those homes. I saw Gus work with the shovel, help dig footings, to help mix concrete and put in footings to build the concrete block basement walls and saw him later help put a

roof on, carpenter work, from start to fin-ish. I worked with Gus on the brickwork and I saw him on other homes, approximately 15 homes were built in there. Most of the work while I was there was done from start to beginning and he and Gus alone, and another man named Chris Knarr."

Toward the end of Mr. Warmann's life, he (Mr. Warmann) and Gus were planning one of the hunting trips they took every fall, and Mrs. Warmann "told me. Uncle Will's health wasn't good, she was concerned about it, he was doctoring, had a heart condition, would get dizzy spells, and she said to me, she says, 'He can't go unless Gus is with him.' She told me she was happy Gus agreed to go, because she said, 'Should anything happen to him, Gus will take good care of him.' She says, 'It takes a load off of me, I feel so relieved because Gus can do the driving.'" After Mr. Warmann's death, the witness saw Gus "on more than one occasion when he was cutting the lawn. I saw him working in a grape arbor trimming it; and one time he was doing some work in the orchard." And, "There were other occasions I went up and she [Mrs. Warmann] told me how much Gus had meant to her and Uncle Will, saying, 'I don't know what I would have done without him. Gus is so good to me and will do anything I want.'"

William F. Glauert, plaintiff's brother, recounted a conversation which occurred during the last week of 1941 when witness and Mr. Warmann were hunting near Wentzville: "Q. What conversation did you have with Uncle Will at that time? A. He was talking about the brickyard, and he said that—I got away from him, and—Q. You got away from the brickyard? A. Yes. I worked for him before. He said, 'Gus stuck with me.' I said, 'Maybe it would have been better if Gus got away, too.' He says, 'What do you mean?' I says, 'Well, you are paying Gus $4.00 a day and he can go out and make fourteen. A man that could make $14.00 a day doesn't work for four.' He said, 'Don't worry about Gus. He will get the Kingsland Avenue property and the farm.' I says,

'Then you have an agreement?' He said, 'Yes,' and that was the end of the conversation. We got into a bunch of birds and forgot about everything and started shooting quail." The witness also testified that Gus also worked for "Aunt Ida" (Mrs. Warmann) after Mr. Warmann's death.

Lydia Carver, plaintiff's sister, testified that she had been in the Warmann home frequently from the time of the Warmanns' marriage until Mrs. Warmann's death. She recounted the following conversations, at the times indicated:

About 1943 Mrs. Warmann told witness: " 'He [Gus] was cleaning the clinkers out of the basement and we [Mr. and Mrs. Warmann] gave him so little for it,' but she said, 'I am not trying to pay him.' She said, 'In the end, when he does these things so faithfully, he is going to be compensated in the end and is going to be well provided for and will be protected. He is going to have the farm and the Kingsland Avenue property.'" In 1947 or 1948, on the back porch of her home, Mrs. Warmann said: " 'There is Gus working for me again. He planted those geraniums out there and is watering them.' She said, 'Lydie, because Gus has been so good, he has carried out all these jobs so faithfully, and Will and I loved him so dearly, and thought so much of him, and Will wanted for Gus to have the farm and the Kingsland Avenue property, and because of that I am going to go along with his ideas and his wishes and carry them out fully, that is what Will wanted,' * * *." On the way to funeral of Sophie Warmann on June 1, 1948, Mrs. Warmann said, " * * * that she and Will had agreed * * * that whoever would be the last of the survivor of those two and if—due to the fact she said 'It is me in this case, Gus is going to get the farm and the Kingsland Avenue property.'" The same day at the cemetery, Mrs. Warmann said, "Our agreement was that if Gus was good to me and we decided he was to have these two pieces of property, the farm and the Kingsland Avenue property." In 1948 at Mrs. Warmann's home, she said, "Gus is thin, but I hope you won't feel this is any of my fault because

Will and I have loved Gus so much, and he doesn't need to worry at all because if he carries out our wishes to the end faithfully, as we expected him to, there is no doubt at all but that he gets the farm and the Kingsland Avenue property." In the fall of 1950, in Mrs. Warmann's home, she said, " * *. * she told me they loved Gus dearly, that he meant everything to them, and she said that farm, 'Will and I agreed to give it to him and it is his, he is going to have it, I want him to have it.' * * * She said that the farm was to be Gus's because he had been so faithful and he had carried out their wishes as they had expected and, if he had done that then the farm was to go to Gus Glauert. On that day she spoke about the farm only." In the fall of 1950, in the home on North 70th Street: "I said to her, 'Aunt Ida, why are you upset?' She said, '* * * I'm upset because Ernst Huning is begging me for that farm' and she said, '* * *. What do you mean, give you that farm? * * * Why that farm belongs to Gus.'" The witness also testified that she and her brothers and sister were plaintiffs in a pending suit apparently involving an effort to recover property from the estate of Mrs. Warmann, but that that suit did not involve the property here in question.

On the Kingsland property, there is a "business building" and a home which had been moved to the rear of the property. Carter Brown, who at the time of the trial and for 15 years prior thereto had occupied the "business building" wherein he conducted a salvage business, testified that about 1937 (apparently shortly after the Warmanns had acquired the Kingsland property) Mr. Warmann had given him a "verbal lease" for an indefinite time, and had stated to him, "'When you get going I will sell you the place of business.' * * * he stated it took about eight years to realize anything out of the business before you started to do anything." Witness also testified that after Mr. Warmann's death and over a period of six years until about 1948, he had talked with Mrs. Warmann about the Kingsland property. We quote: "I told her I would like to build more build-ings, improve the property and buy the property, and she stated that that property, Kingsland Avenue and the farm, is Gus's. 'We left that to Gus. I cannot sell it to you, Mr. Brown.' I went so far as to have one of my attorneys talk to her and I still could not buy. * * *

"Q. How many times would you say you talked with her trying to persuade her to let you buy this property? A. Twelve or fourteen times.

"Q. What was her usual reply? A. That the property belonged to Gus, that and the farm. It was Gus's property and she could not sell it to me.

"Q. During the time you lived up there and conducted this business, did you ever see Gus performing services for Mr. Warmann? A. I did. * * * He continued on as maintenance man for a while—I don't know how long, but I saw him going up and down the street with ladders and paint buckets on his car. He painted the house. * * *

"Q. But he indicated to you if your business was profitable he would sell you the property? A. That he would talk to me, yes, sir. * * *."

Mrs. Doris Brown, wife of the preceding witness, testified that she had also talked with Mrs. Warmann on several occasions: "I would just ask if she would sell us the place. We had been wanting the ground, and she just said that it was Gus's, her nephew's, that it had been left to him, that Mr. Warmann left it to him."

Mrs. Elsie Huskey testified that she and her husband had known the Warmanns since 1936; that they became acquainted through an effort of Mr. Huskey to purchase a bird dog from Mr. Warmann; that witness thereafter visited them often. During these visits she often heard conversations concerning Gus. The first conversation concerning the farm and Gus was probably in the spring of 1942 when the witness and her husband were at the Warmanns' home. "We were out there and he [Mr. Warmann] told us he had bought the farm and that he had planned to build

a lake on it and that Gus was going to help him build this lake and he said, 'because Gus is going to get this farm after I pass on.' And then about two weeks before Mr. Warmann was killed—that was the end of September—he was over to our house one Sunday morning and both my husband and I were outside, we were talking about dogs. My husband said to him he thought he was a little thin looking. He said he thought he was working a little too hard. Mr. Warmann says, 'Yes, I know I have been working hard.' He says 'Gus and I have been doing a lot of hard work at the farm.' That was just before gasoline rationing was going into effect. He said, 'Gus has been telling me, too, I have been working too hard and should quit,' and Mr. Warmann said then, 'I told Gus he doesn't have to worry about the farm because he will be fishing in that farm long after I am dead', and he told him—he told us then, 'because Gus gets the farm.'" The witness said that after Mr. Warmann's death, "We would go out there, or, at least every other week or two to three weeks, * * * and I believe that every time we went out there was a discussion of some kind of the farm; at first she wanted to go out to see the farm. She asked us if we would take her out some time. We said we would, * * * she wanted us to take us out there; yet she wanted Gus to take her out because she told us then it was Gus's farm and that she thought maybe he should take her out there, but—and so many times she always—she always referred to the farm as Gus's. * * * Mrs. Warmann told us she felt she could call on Gus at all times to do any kind of work for her that was to be done. He came out to the house, he would work on her furnace * * * in the spring and summer of every year he would cut their grass. * * * Different times we would be there she would say, 'Gus was out today', and several times we met Gus out there and he had been doing some work of some kind. He helped clear out the garage * * * and she said, 'He has been so good to me that,' she said, 'money couldn't repay him for the goodness he has been to us.' * * * At different times that she would talk about the farm she would always

add that Gus was to get the farm and the Kingsland property. She said, 'Mr. Warmann and I had agreed on that at the time of the purchase of the farm, because,' she said, they felt that that was the way to repay Gus for the things he did for them. * * *

"Q. Did she ever discuss the will Mr. Warmann left? A. She discussed it many times.

"Q. Did she tell you that that will had specified that the farm and the Kingsland Avenue property was to go to Gus? A. Yes, she did.

"Q. Did she tell you that is why she felt Gus should have the farm? A. She said she agreed—she and Mr. Warmann— * * * Yes. I don't think she just said that particularly, that he was to have the farm on account of his doing all those things for her, but she said that 'Gus has always been Mr. Warmann's favorite nephew.' * * *

"Q. Now, Mrs. Huskey, let's confine your answer to my question, if you will, please. I am asking if she ever told you on any of those occasions when she mentioned about Mr. Warmann's will leaving that farm and the Kingsland property to Gus, that that is the reason why Gus should have the farm? A. I will say yes to that. * * * Both Mr. and Mrs. Warmann told us how much they thought of Gus all the time. * * * And that they felt free to call on Gus at any time—Mrs. Warmann said this, that she felt free to call on Gus at any time to do any kind of work she asked him to do and he was always willing to do it and she says, 'I feel I couldn't pay him in money what that was worth to me.' "

Harold Oberlag leased the Warren County farm in the spring of 1942 and moved there July 23, 1942. In the spring of 1942 when witness and his wife were at the farm attempting to lease it, witness said: "Well, when we agreed on the rent, the amount of rent, and to have a lease drawn up, he said that if I lived on the place a couple of years and liked it there that he would give me an extension on my lease for five years,

if I wanted it, and because he said, if something would happen to him or Mrs. Warmann, that Gus would get the place and he said Gus wouldn't want to farm it. * * * Q. Was Ida Warmann there at that time? A. Yes, sir. * * * It was down * * * by the gate * * * [to] the barn lot. Q. When he told you Gus would get the place if anything happened to him or Ida, did Ida say or do anything? * * * A. I would say she nodded her head." Witness further testified that Mr. Warmann had repeated this statement about Gus getting the farm about a month before Mr. Warmann's death, and had mentioned it several times between the spring of 1942 and the date of his death. Mr. Warmann said, " 'I don't know how long I am going to live,' but he says, 'The place will go to Gus after we are gone.' " After Mr. Warmann's death, Gus did some work on the unfinished pond at the farm. Every day Mr. Warmann was there, Gus was with him, until within two or three weeks before Mr. Warmann's death.

Mrs. Effie Oberlag, wife of the preceding witness, testified that, in the spring of 1942, "Mr. Warmann and Harold were talking about the terms of the rent on the place and I heard him tell my husband that if we lived there for two or three years and liked the place, that he would give us an extension of five years, and that—because he was sure that the place would go to Gus and that he knew Gus wouldn't want to farm it himself. Q. Did Aunt Ida join in the conversation in any way? A. Well, she didn't—she just nodded her head in approval. She didn't say anything."

Belle T. Pardue was the daughter of Mr. Warmann's one-time doctor. Her father had originally been Warmann's partner in the brickyard, but had sold his interest in about 1912. Miss Pardue visited Mrs. Warmann frequently after Mr. Warmann's death. She testified: "Later on she told me she wanted Gus to have the farm. Q. Did she say why? A. I was there and Gus had been painting, I think it was the barn, I am not real sure. I asked what Gus charged her. I wanted some painting done and if he wasn't too expensive I would hire him. She said, 'I don't give him hardly anything. Sometimes I give him a little something. Sometimes I don't.' She says, 'Gus does things for me mostly for nothing.' I says, 'That is awfully good of him.' She said, 'Of course, Gus will get his reward because he is going to get the farm and the Kingsland Avenue property; that is why I don't pay him anything. Gus is going to get it and that is why.' Later on, around in the latter part of September or October, I went to visit her and she said she didn't know what to do, she didn't know whether—she was living so long, she didn't think Gus should have to wait so long for the farm, and she thought she should deed it to Gus. She asked if I thought she should deed it to Gus, and she asked if I thought Gus would give her the income off of it as long as she lived. I said she would have to make that arrangement with Gus, * * * she said she and Willie always agreed Gus should have the Kingsland Avenue property and the farm. She mentioned that time and again. * * * She frequently brought it up. It seemed to worry her. She wanted to be sure Gus got the farm. * * * I saw her about two weeks before she died. I stopped by on the way home from school, and she said if she felt a little better she almost decided to go to Surkamp's and deed the farm to Gus and give it to him then. In fact, she asked if I thought Mr. Surkamp would make out the deed for her, but I didn't give her any advice about it. * * * she told me two weeks before she died that Gus was going to get the farm when she died, that that was her understanding, Gus was going to get it. Q. Her understanding was reached because it was in Mr. Warmann's will? A. No, she didn't say that. From the way she talked I thought it was in her will. * * * she didn't mention the Kingsland Avenue property" at that time. "Very frequently when I went to see her Gus was there working. One time he was painting the barn, then he repaired some windows that had broken out of the barn. She said several times Gus did everything for her, that she called on Gus."

W. A. Pardue had formerly for 25 years been employed by the International Shoe Company and for a time as its division manager; he was at the time of trial president of the Pardue Motor Company and president of the Greater St. Louis Trailer Camp Company. He testified that in September 1950: "My sister and I were taking her [Mrs. Warmann] to the Deaconess Hospital to see a mutual friend who had had an operation, and on the way she mentioned the fact that she was very much disturbed. * * * because she didn't know what to do about the farm, and we questioned her and she said, well, Will wanted Gus to have the farm, and she didn't know whether to give Gus the farm now, that is, during her life-time, or to let him get it after her death. She said she hadn't been able to decide but she said 'I would hate for anything to happen and to meet Will after my death and not have Gus owning the farm. * * * That was the substance of it. * * * Q. She expressed herself in doubt as to what she should do? A. Yes, whether to give him the farm immediately or wait until after her death to get it. Q. And she said Will had wanted him to have it? A. Yes."

Catherine Johnston, plaintiff's sister, testified that in July 1950, when she and her husband were taking Mrs. Warmann to visit the cemetery, Mrs. Warmann "was very nervous and upset and the reason she was happy we came out was because she was afraid Ernst [defendant Huning] would come again to ask her for the farm, and she said it made her so nervous because he always asked with tears in his eyes and she says, 'That upsets me so', and she said, 'I told him, No, Ernst, the farm belongs to Gus. That is what Will and I both agreed to.' * * * She said Ernst had been asking her for the farm and she told him it belonged to Gus, that is what she and Uncle Will had agreed to."

John Johnston, husband of preceding witness and Gus' good friend, testified that in 1950: "One Sunday afternoon we went over to get her [Mrs. Warmann] to go out to the cemetery. * * * When he got over there and went in the house she said she was glad we came there, that she was all upset and nervous. She said she was afraid Ernest would come over there, that he had been over there asking for the farm and she says, 'No, Ernest, that farm goes to Gus, the farm belongs to Gus,' she says, 'that is what Uncle Will and I both agreed to.' * * * When I came back from the florist and got in the car she did say, Gus was very good to her and he was doing some work on a house where he worked on the porch and tuckpointed a chimney for her."

Anna E. Knoll, who said she was Mrs. Warmann's close friend, testified that, several years prior to trial time and after Mr. Warmann died, Mrs. Warmann told her that Judge Hughes had brought her (Mrs. Warmann) a will. "She was very much disturbed because Gus was not mentioned in that will * * *. She tore it up and * * * said she wanted him to have the farm because he was very good to her in all ways."

Defendants' evidence. Ernst A. Huning, the Warmanns' nephew, a legatee in, and executor of, Mrs. Warmann's will, and an instant defendant, testified that, about two weeks after Mr. Warmann's death, he went to Mrs. Warmann's home at her request and examined Mr. Warmann's papers. He found the deed or certificate of title indicating that the farm had been acquired as an estate by the entirety. Witness said: "I told her that under this deed that Gus wasn't to get the farm and she had better call an attorney, a lawyer. That is as far as I was going.

"Q. Is that the only conversation you ever had with Mrs. Warmann about the Warren County farm? A. That is all.

"Q. Now, how often did you see Mrs. Warmann after Mr. Warmann's death on an average? I realize you can't say every time. A. I would say once a month.

"Q. What was the occasion? A. I made up her income tax returns, paid the county real estate. * * *

"Q. Was your wife with you on every occasion when you were there? A. Every one.

"Q. Did you on any occasion when you were out there ever make any statements to her about the Warren County property? A. I did not.

"Q. Did you ever request Mrs. Warmann or demand of Mrs. Warmann that she deed the Warren County property to you? A. No, sir. * * *

"Q. Did Mrs. Warmann ever make any statements to you after Mr. Warmann's death concerning the Warren County property and Gus Glauert? A. No.

"Q. Never made any statements to you about it? A. None whatever."

The witness also testified that to his knowledge Mrs. Warmann did employ Judge Hughes as her lawyer and that he represented her until the time of her death.

Nellie Huning, wife of the preceding witness, and a defendant, testified that, in the fall of 1942, apparently shortly after Mr. Warmann's death: "Well, at the time the papers were gone over and it was decided that the property was in both names, she [Mrs. Warmann] came out of the room and says to us that Gus doesn't get the property.

"Q. Said to whom? A. To my husband and I.

"Q. Who was there at that time? A. Gus and the lawyer he had, Mr. Smith, and Judge Hughes and my husband and I and Mrs. Warmann.

"Q. She came out of the room where they were to where you and your husband were and what did she say? A. She said, 'Gus doesn't get the farm.'

"Q. 'Gus doesn't get the farm'? A. Yes, and that she was going to give it to my husband."

Mrs. Rueweler, Mrs. Warmann's sister and a defendant, testified that she had seen Gus at Mrs. Warmann's home quite often cutting the grass; that she had seen Mrs. Warmann pay him in paper money every time she saw him do anything for Mrs. Warmann; the witness described a conversation with Mrs. Warmann as follows: "Well, * * * one day, * * * she [Mrs. Warmann] was all excited, she said, 'I'm afraid Gus Glauert is going to come and harm me some day to get those papers away from me.' I said, 'Where in the world have you got the papers [the deed for the farm]?' * * * She said, 'When you don't sleep here I have them underneath my pillow.'" As a result of that conversation, witness and Mrs. Warmann took the deed and put it in a safe deposit box at a bank in Wellston. Witness stayed at Mrs. Warmann's home while Mrs. Warmann was in the hospital (with a broken hip), and remained there afterward "because then I didn't have no home and I was staying there. * * * Q. She did tell you, as I understand you, that Gus had been there demanding a deed to the farm? A. Yes, and she was afraid he was going to come and take it away from her. * * * Q. Outside of the conversation you have related about the deed to the farm—that is the deed by which the farm was transferred to Mr. & Mrs. Warmann—A. Yes. Q. —she didn't talk to you about the farm and Gus further than that, did she? A. No."

Joseph P. Smith, an engineer at Glenridge School in Clayton, had lived for 25 years very close to the Warmann home, had known them and had had occasion to see Mrs. Warmann frequently at her home; beginning four or five years after Mr. Warmann's death, he took care of Mrs. Warmann's property by seeing to the maintenance of it and collecting rents for her. He had seen Gus at Mrs. Warmann's home. "He used to cut the grass and stuff like that. * * * I seen him tuckpointing when I came by there from work." He saw Gus there two or three times when he (the witness) happened to be there. The witness testified that, a short time before Mrs. Warmann's death, "I had brought in the rent from collecting which she always waited for me in the evening, and when I come in she was very nervous—she couldn't

hardly get the door open—and when I got in I said to her, her face was blood red and I said, 'What happened?' She says, Gus had been here today and had raised a lot of cain, he wanted this farm and he wanted her to make out a will so he could get this farm or else fifty per cent of the property, and she says, 'I'm not going to do it,' and she said, 'I'm scared of him, and I'm going to take my papers and hide them so he can't get them.' I said, 'That is up to you,' and she said, 'Gus even told me he wouldn't put up my glass storm sash in the porch,' and I said, 'Let them sit there a while, he may be back.' She said, 'If he don't come back will you put them up?' I said, 'Yes,' but I says, 'Leave it go a couple of weeks;' in a couple of weeks Gus come back and put them up for her. * * * * At that very time I was talking to her before she said, 'If I was to deed this farm over to Gus and give him this, could I collect the rent off of it.' I said, 'Mrs. Warmann, if you were to deed the farm to Gus you couldn't collect nothing because Gus would own the farm,' then she said, 'Then I'm not going to do it.' * * * * "

Ogla C. Smith, wife of the preceding witness, testified that she was in Mrs. Warmann's home off and on after Mrs. Warmann broke her hip in 1946; she was there sometimes several times a week; that Mrs. Warmann's three sisters looked after Mrs. Warmann while she was in and after she returned from the hospital, and that Mrs. Rueweler remained there a year after Mrs. Warmann returned from the hospital and thereafter stayed with Mrs. Warmann at night; that she saw Gus at Mrs. Warmann's cutting the grass once in awhile; she didn't see him do anything else except clean the gutters one time, although she did see him going toward the house. Once in the fall of 1950 was the only time Mrs. Warmann mentioned the farm. "She said, 'Gus was here again today and he wants me to give fifty per cent to his family and fifty per cent to my family' but she said, 'Will'—meaning her husband—'he didn't think anything—to give anything to my family and I'm not going to give anything

to his.' * * * She said Gus had asked for the farm, but that is all there was to that. She didn't say what it was about it. Q. The only statement she made about Gus then and his compensation was this occasion you just testified to? A. Yes. She got so she called him, 'Mr. 50–50 was here again today', and she would be all worked up over it."

In our review of this case, we weigh the evidence, make our own findings, and reach our own conclusions, taking into account, however, the trial chancellor's position to have determined the credibility of the witnesses who appeared before him. The trial chancellor filed with the judgment a memorandum to the effect that the evidence was not sufficient to prove the pleaded contract. The memorandum indicates that the trial chancellor's conclusion was not based upon findings which turned upon his determination as to the credibility of the witnesses who appeared before him. We are unable to agree with the trial chancellor's conclusion. On the contrary, we think that a consideration of all the evidence requires the conclusion that plaintiff established by convincing evidence the agreement essentially as pleaded.

In our attempt to weigh the evidence and to determine whether the contract was established, we bear in mind that the contract was oral, that plaintiff could not testify, and that a plaintiff in this type of case must necessarily usually rely upon "piece-meal" recitals by various witnesses. Maness v. Graham, 346 Mo. 738, 743, 142 S.W.2d 1009, 1012, 130 A.L.R. 225, Ver Standig v. St. Louis Union Trust Co., 344 Mo. 880, 884[3], 129 S.W.2d 905, 907[4–7]. We also consider that "The witnesses may speak their own language if, with its background and context, their thought and meaning are clear and the contract is adequately and definitely proven on the whole record." Sportsman v. Halstead, 347 Mo. 286, 299[5], 147 S.W.2d 447, 454[7].

Although defendants did not plead the Statute of Frauds and did not object to

testimony adduced in support of the oral contract (See State ex rel. Place v. Bland, 353 Mo. 639, 651, 655, 183 S.W.2d 878, 886 [8, 9], 888[16]), the fact remains that the contract sought to be established was an oral contract and, we think, clear and convincing proof of its existence was required.

It appears to us from a consideration of the evidence which has been set forth, that plaintiff, over a long period of years worked for his uncle, Mr. Warmann, because of a promise that he, plaintiff, would be compensated in some manner; not only to augment the inadequate wages which plaintiff received while working for Mr. Warmann, but to compensate plaintiff for the faithfulness of his service and for holding himself answerable to the Warmanns' beck and call. And it appears that plaintiff "agreed to stay with him." By 1942 the general understanding which had theretofore existed was made definite and an agreement was reached by the plaintiff and both Mr. and Mrs. Warmann that if plaintiff continued to render the services that either or both Mr. and Mrs. Warmann required and requested, then, to compensate for past services and in consideration of plaintiff's agreement to continue, at the death of the survivor of the Warmanns, plaintiff was to receive the properties in question. We have arrived at these conclusions after a careful consideration of the evidence as a whole and the cumulative force of all the evidence.

Plaintiff worked for Mr. Warmann as a bricklayer for 40¢ an hour when the union scale was $12 or more, and agreed to continue to do so; he continued to work when requested for $4 a day at a time when he could have been making $14 a day. The arrangement continued over a long period of years. Both Mr. and Mrs. Warmann felt free to call on plaintiff at any time. They expressed their appreciation for plaintiff's services and faithfulness on many occasions, and Mrs. Warmann, after her husband's death, continued to express her appreciation for and satisfaction with the manner in which plaintiff carried on in performing services for her when requested to do so.

Late in 1941, Mr. Warmann stated in effect that he had an agreement with Gus that Gus was to get the farm and the Kingsland property. In the spring of 1942, Mr. Warmann stated (and the inference is that the statement was made in the presence of Mrs. Warmann): "Gus is going to get this farm after I pass on." He said on other occasions, "The place will go to Gus after we are gone." And again in 1942, Mr. Warmann said that the farm "would go to Gus", to which statement Mrs. Warmann nodded her approval.

After Mr. Warmann's death in October 1942, Mrs. Warmann repeatedly, and up to a time shortly before her death in 1950, made these statements: "He [Gus] is going to have the farm and the Kingsland Avenue property"; they [the Warmanns] "had agreed * * * Gus is going to get the farm and the Kingsland Avenue property"; "Our agreement was that if Gus was good to me * * * he was to have * * * the farm and Kingsland Avenue property"; if Gus faithfully carried out their wishes to the end "as we expected him to, * * * he gets the farm and the Kingsland Avenue property"; "Will and I agreed to give it [the farm] to him"; "Gus was to get the farm and the Kingsland property. * * * 'Mr. Warmann and I had agreed on that at the time of the purchase of the farm,' * * * to repay Gus for the things he did for them"; "she and Willie always agreed Gus should have the Kingsland Avenue property and the farm"; "* * * the farm belongs to Gus. That is what Will and I both agreed to"; and she said two weeks before her death "that Gus was going to get the farm when she died, that that was her understanding."

Now we are aware that certain other statements made by Mrs. Warmann, standing alone and not considered in the light of all her statements, would indicate only that she intended to carry out the wish and desire of her husband to reward the plaintiff,

and, inferentially at least, would indicate that there was no agreement either between herself and her husband or between either of them and Gus as to the property involved. For example, in 1947 or 1948, Mrs. Warmann stated that she was going along with Will's ideas and carry them out fully—that is what Will wanted; she said to Mrs. Brown, the wife of the Kingsland property tenant, that she, Mrs. Warmann, couldn't sell the Kingsland property because Mr. Warmann left it to Gus. And she said to Mr. Pardue, "Will wanted Gus to have the farm." But when these and other similar statements, heretofore set forth, are considered in the light of her definite statements indicating an agreement between herself and her husband that Gus was to receive the properties, we are of the opinion that such other statements do not destroy or materially weaken the probative effect of Mrs. Warmann's statements tending to prove that there was a definite agreement.

It is true, as contended by defendants, that nowhere in the evidence is there any testimony that any statements made by Mr. or Mrs. Warmann as to any agreement with reference to the properties were made in the presence of the plaintiff. But we do not agree that there is any decisive significance to this fact when it is considered: that plaintiff was not permitted to testify, that the entire course of action of plaintiff over a long period of years was indicative of the existence of some agreement between him and the Warmanns, and that plaintiff, after the death of Mr. Warmann, continued to faithfully remain in the service of Mrs. Warmann. We think the fact that the Warmanns were husband and wife and the course of conduct of the parties gives meaning to the statements by both Mr. and Mrs. Warmann in which the word "agreement" was used. And we think no other inference is reasonable than that the "agreement" referred to was an agreement which plaintiff had with Mr. and Mrs. Warmann.

One compelling reason for our ultimate conclusion herein is that, in April 1942, Mr.

Warmann made a will in which, as noted, he left to plaintiff the two pieces of property which he had theretofore said were the subject of an "agreement" with Gus. Mr. Warmann's will, considered in the context of the oral testimony, constitutes cogent evidence that there was an agreement and that Mr. Warmann had attempted to perform his part thereof.

The circumstances leading up to and surrounding the execution of Mrs. Warmann's will on April 22, 1943, within six months after her husband's death, are not developed in the evidence to the extent that the significance of her will may be accurately determined. If full credence is given to the testimony of defendant Ernst Huning and his wife, the conclusion is compelled that at the time Mrs. Warmann drew her will, Mrs. Warmann knew that she held the title to the farm and that she had been advised that plaintiff did not get the farm by virtue of her husband's will. Mr. Huning said that his sole and only conversation with Mrs. Warmann concerning the Warren County farm was the one in which he told her that plaintiff did not get the farm under Mr. Warmann's will and advised her to consult a lawyer. Mrs. Huning testified that she and her husband were present at a time (apparently the same time referred to by her husband) when plaintiff and his lawyer and Mrs. Warmann and her lawyer were present in a conference; that Mrs. Warmann, following the conference, said to Mr. and Mrs. Huning that plaintiff "doesn't get the farm" and that she (Mrs. Warmann) was going to give it to Mr. Huning. (Incidentally we note that Mr. Huning testified positively that his wife was with him on every occasion when he visited Mrs. Warman subsequent to Mr. Warmann's death and that the conversation related by him above was the *only* conversation he ever had with Mrs. Warmann about the farm. Despite this clear and definite testimony, Mrs. Huning, referring to the same occasion to which Mr. Huning referred, viz., when the papers were being examined, told of the presence of lawyers and testified that Mrs. War-

mann on that occasion said that Mr. Huning and not Gus was to get the farm. Either Mr. Huning was mistaken when he described his one and only conversation with Mrs. Warmann concerning the farm, or Mrs. Huning was mistaken when she said that Mrs. Warmann told her and her husband, "Gus doesn't get the farm * * * and that she was going to give it to" Mr. Huning. It would appear extremely doubtful that Mr. Huning would have overlooked a statement so important from his standpoint, particularly in view of the obvious effort of his counsel at the trial to search his recollection and elicit the definite statement that no conversations other than the one he had related ever occurred.)

■ Be that as it may, the fact remains that according to the Hunings' testimony, Mrs. Warmann knew when she signed her will that plaintiff would not receive the farm by virtue of Mr. Warmann's will. If the inference be drawn that Mrs. Warmann also knew that the Kingsland property (there was no direct testimony indicating such knowledge) would not pass to plaintiff by virtue of her husband's will, and if the further inference be made that Mrs. Warmann. intended therefore that her will (though not mentioning the farm or the Kingsland property by name or description) effectively devised those properties to someone other than plaintiff, then her will was a repudiation of her agreement with her husband and plaintiff, if such agreement existed. And "If a contractual obligation existed, the making of the will could not defeat plaintiffs' right to recover." Chandler v. Hulen, 335 Mo. 167, 174, 71 S.W.2d 752, 756. Under the circumstances just hypothesized, her will and the terms of it constituted some evidence indicating that she had no agreement either with plaintiff or with Mr. Warmann for the benefit of plaintiff. If, on the contrary, an agreement did exist and the inference be drawn that Mrs. Warmann believed that the provisions of her husband's will would effectively perform their obligation under the agreement with plaintiff, then the terms of Mrs. Warmann's will could not reasonably be construed as evidence tending to indicate that there was no contract with plaintiff.

As bearing upon this aspect of the case, we point to the testimony of the apparently disinterested witnesses, Mr. and Mrs. Carter Brown, tenants in the Kingsland property. These witnesses, it will be recalled, testified that they repeatedly requested that Mrs. Warmann sell them the Kingsland property and that these requests continued from the time of Mr. Warmann's death in 1942 until 1948. Her invariable reply was either, "We left that to Gus. I cannot sell it to you, Mr. Brown" or "it was Gus's, her nephew's, that it had been left to him, that Mr. Warmann left it to him." And to the testimony of Mr. Pardue, who, so far as the record shows, was also a disinterested witness, who testified that in September 1950 Mrs. Warmann said that her husband wanted Gus to have the farm and that she didn't know whether to deed the farm to Gus during her lifetime or "to let him get it after her death" and, "I would hate for anything to happen and to meet Will after my death and not have Gus owning the farm." If Mrs. Warmann believed that Mr. Warmann's will had not effectively devised the farm and the Kingsland property to Gus at her death and, on the contrary, believed that her will had effectively devised the farm and Kingsland property to someone other than Gus, then these statements to Mr. and Mrs. Brown and to Mr. Pardue were wholly irreconcilable with and inconsistent with such hypotheses. These statements are persuasive that Mrs. Warmann did not realize that her will may have effectively disposed of these properties to somone other than Gus. And certainly when the statements are considered in the light of Mrs. Warmann's other statements subsequent to her husband's death, we think the record as a whole supports the conclusion that Mrs. Warmann in fact recognized that she had a definite obligation and not simply a desire to carry out the wishes of her husband toward a favorite nephew.

■ We think that on the whole record an unambiguous agreement existed among plaintiff and the Warmanns, that it was

fair and based on an adequate consideration, that plaintiff fully performed, and that his acts of performance were not referable to any other contract. Even so, the remedy in the nature of specific performance should not be granted as a matter of right. Is plaintiff's performance adequately compensable in money? It is true that the particular services performed by plaintiff were not in themselves of such nature that they would not, under usual circumstances, be compensable by money. But in our view, it was not so much the specific things which plaintiff did for the Warmanns which characterized the nature of the agreement; it was rather that plaintiff, through the years, held himself in readiness to answer their beck and call. Furthermore, plaintiff forewent his opportunities to earn adequate compensation and to accumulate money; and, more important, he forewent his right to claim the reasonable value of the uncompensated services rendered to Mr. Warmann by a claim against his uncle's estate (now barred), in reliance upon the agreement.

While the admitted value of the two properties involved is high, we think there is no pecuniary standard by which plaintiff's performance of his agreement can be measured; and that to refuse plaintiff relief in the nature of specific performance would work an injustice and be inequitable.

The judgment is reversed and the cause remanded with directions to take an accounting as to rents and profits from the properties involved, and thereafter to enter a judgment in conformity with this opinion.

VAN OSDOL, C., concurs.

LOZIER, C., dissents.

PER CURIAM.

The foregoing opinion by COIL, C., is adopted as the opinion of the court.

All concur.