**126**

William GLAUERT, Guardian of the Person and Estate of Henry Glauert, non compos mentis, William Glauert, August Glauert, Theodore Glauert, Edward Glauert, Katherine Glauert Johnston, and Lydie Glauert Carver, Plaintiffs-Respondents,

v.

Ernst HUNING, Nellie M. Huning, His Wife, Ernst Huning, Executor of the Estate of Ida K. Warmann, Deceased, Emelia Schlingmann, Lizzie Schlingmann, Lena Rueweler, Della Boeckhaus, and William Boeckhaus, Her Husband, Defendants-Appellants.

No. 44910.

Supreme Court of Missouri.
Division No. 1.

April 9, 1956.

Rehearing Denied May 14, 1956.

John A. Nolan, Carl V. Eimbeck, Clayton, for appellants.

Cox, Cox & Cox, Harvey B. Cox, William A. Moffitt, Jr., St. Louis, Finley, Lucas & Arnold, John A. Arnold, Ralph T. Finley, St. Louis, for respondents.

WESTHUES, Judge.

This is a suit to try and determine title to twelve parcels of real estate in St. Louis County, Missouri.

Plaintiffs alleged in their petition that they and the defendant Ernst Huning are the owners in fee of the twelve parcels of real estate claiming the same through their uncle, William H. Warmann. The defendants assert that they are the owners in fee of the property claiming the same through Ida K. Warmann who was the wife of William H. Warmann. A trial resulted in a decree for plaintiffs, that is, plaintiffs and the defendant Ernst Huning were declared to be the owners of the property. From that judgment, defendants appealed.

Title to the twelve parcels of real estate had been held in the name of William H. Warmann and his wife, Ida K., as husband and wife. William H. Warmann died testate on October 18, 1942. By his will, dated April 1, 1942, he gave his real estate to his wife for life and at her death, to his nieces and nephews. Ida K. Warmann died testate on December 31, 1950. In her will, she gave her property to four sisters and her nephew Ernst Huning, to each a 1/5 interest.

Plaintiffs' theory was and is that Mr. Warmann was the real or equitable owner of the property in question even though title was in the name of Mr. Warmann and his wife; that Mr. Warmann and his wife had an understanding or agreement that Mr. Warmann's property was to go to his nieces and nephews and that Mrs. Warmann's property was to go to her heirs or to whom she wished to give it. Defendants denied that any such agreement existed and also defended on other grounds which we shall discuss later in the opinion.

Before making a detailed statement of the present case, we call attention to the case of Glauert v. Huning, Mo., 266 S.W. 2d 653, which was a suit by one of the plaintiffs in this case. In that case, August Glauert (also referred to as Gus) claimed that Mr. and Mrs. Warmann promised to give him a farm in Warren County and a parcel of real estate in St. Louis County in consideration of services performed by him for the Warmanns. By the will of Mr. Warmann, the two parcels of real estate were devised to August Glauert. By the will of Mrs. Warmann, her property was

given to her sisters and a nephew, Ernst Huning, a defendant in the case now before us. Title to this property, that is, the two parcels claimed by August, had also been in the name of the Warmanns as husband and wife. On appeal, this court directed that a decree be entered in favor of August. We call attention to that case, not that it is controlling on any of the issues in the present case, but for reference and for a more detailed statement of the background and events occurring during the lives of the Warmanns.

The evidence in the case before us disclosed the following: Mr. Warmann was a bricklayer by trade. He acquired a brickyard which he sold in January, 1923, to the Hydraulic-Press Brick Co. of St. Louis for $100,000. Originally, he had been the owner of a one-half interest in the brick plant and about 1912, he had bought the other one-half interest. The Warmanns were married about 1915. Mr. Warmann at that time was about forty-five years old and Mrs. Warmann forty-two. They had no children. After the brickyard was sold, Warmann engaged in building houses and title to property purchased was placed in the name of Mr. Warmann and his wife. By the will of Mr. Warmann, as mentioned above, he devised a farm in Warren County, Missouri, and a parcel of real estate in St. Louis County, Missouri, to his nephew, August (Gus) Glauert. Those were the properties which were the subject matter of the lawsuit mentioned above. Mr. Warmann also made a special bequest of $10,000 to his wife and gave her a life estate in all of his real estate including that devised to August with full right and power to sell any part thereof, except the parcels devised to August, and to invest and reinvest the proceeds therefrom. These two parcels were not to be sold or encumbered. To his nephews, Charles and William Warmann, he devised a lot at 6400 Easton Avenue. To plaintiffs in this case, the Glauerts being his nieces and nephews, and to Ernst Huning, he gave all the rest and residue of his estate, share and share alike.

A few days after the death of Mr. Warmann, his widow called the defendant Ernst Huning and asked him to help her look over the papers belonging to her husband's estate. Huning's evidence given at the trial of Glauert v. Huning, supra, was read in this case. His testimony was that the deed to the farm in Warren County was found and that he at that time informed Mrs. Warmann that, according to the deed, Gus was not to get the Warren County farm; that title "was in both names"; that he suggested to Mrs. Warmann that she employ a lawyer which she did, engaging Judge Hughes, formerly Probate Judge of St. Louis County, Missouri.

Thereafter, the will of Mr. Warmann was filed for probate and the estate was administered by August Glauert who had been named as executor. An inventory was filed in the probate court. The property listed in the inventory consisted of two lots valued at $2,200 and $2,000. There was also listed an undivided ⅕ interest in two other lots, each valued at $500; and a collector's deed to a part of a lot valued at $1,500. The total value of the real estate listed was $6,700. Personal property listed consisted mostly of notes and cash, also a truck and a car. The total value of personalty was $11,203.15. The final settlement offered in evidence showed a balance of $5,386.43 which sum the widow accepted in full payment of the special bequest of $10,000. Previously, the widow had been given her statutory allowance. The real estate was not sold. The evidence conclusively showed that Mrs. Warmann, during the remainder of her life after the death of her husband, dealt with all of the real estate including that which had been held as an estate by the entirety as though she had only a life estate therein. She accepted all of the provisions of the will and at no time made an election to reject the will and take her share as a widow. Even though she was given the power of sale by her husband's will, she refused to sell any part of the real estate. The only act on the part of Mrs. Warmann that gave the slightest indication of a claim of ownership of the fee was that by her will she devised all of her property (without describing it) to four sisters and Ernst Huning.

**129**

Plaintiffs introduced an abundance of evidence that Mrs. Warmann had opportunities to sell some of the property but that she repeatedly refused, saying that she wanted to carry out her husband's wishes. On this point, plaintiffs offered the evidence of a number of witnesses who had testified at the trial of the case wherein August Glauert was plaintiff. For that evidence, referred to in the other case, see 266 S.W. 2d loc. cit. 665(4). It will be noted that these witnesses testified that the reason Mrs. Warmann gave for refusing to sell the property was that it did not belong to her. However, there is no reference in the will of Mrs. Warmann of any desire on her part to make any provision for the plaintiffs in this case. Since title to the property was in the name of Mr. and Mrs. Warmann, it passed at Mr. Warmann's death to Mrs. Warmann. This title passed by her will to the defendants in this case.

For plaintiffs to recover in this case, and to overcome the effect of the title so vesting in the defendants, they, the plaintiffs, had the burden of producing evidence of a convincing nature that Mr. and Mrs. Warmann had an agreement or understanding that his property should go to his kin and Mrs. Warmann's property should go to her kin or as she desired. If such an agreement is not reduced to writing, then the statute of frauds steps in and prevents its enforcement unless the oral contract has been at least partially performed.

The inventory filed in the estate of Ida K. Warmann showed personal property, principally notes and cash, appraised at $37,184.84. Real estate listed included the twelve parcels of real estate involved in this case and also the two parcels which were decreed to be the property of August Glauert. The twelve parcels involved herein were valued at approximately $75,000. We are not concerned with the personal property.

The evidence showed beyond a doubt that the twelve parcels of property were obtained through funds belonging to Mr. Warmann. Plaintiffs introduced evidence of statements, made by Mr. Warmann as

well as by Mrs. Warmann, that Mr. Warmann's property was to go to his nephews and nieces, principally the Glauert children of whom the Warmanns were very fond.

Mr. and Mrs. Harry Huskey were called by plaintiffs. Mr. Huskey testified that he was a good friend of the Warmanns; that he and Mr. Warmann were both interested in bird dogs; that Warmann often talked business matters over with him; that they talked about the brick plant; that he often visited in the home; that both of the Warmanns often spoke of how much they thought of the Glauert children.

Elsie Huskey, wife of Harry, testified that after 1936, they, the Huskeys and the Warmanns, visited each other often; that on a number of occasions she heard the Warmanns speak of the Glauerts, saying that the Glauerts would get Mr. Warmann's property. Note her evidence:

"Q. And tell us what they told you about that? A. Well, Mr. Warmann said several times that his money was always to go to the Glauerts and to Ernst Huning. All the money that he had made through the brickyard, in the selling of the property of the brickyard.

"Q. And was Mrs. Warmann there when he told you that? A. Yes.

"Q. What, if anything, did she say in connection with that? A. She said that she agreed to anything that he had ever planned concerning his money.

"Q. Was anything said as to how her money would go? A. She could do with her money as she pleased.

\* \* \* \* \* \*

"Q. (By Mr. Cox) Was the matter discussed, that same matter, on any other occasion? A. Several times.

"Q. Give us an idea as to how many times. A. I would say about three, possibly four.

"Q. Three or possibly four? A. While Mr. and Mrs. Warmann was living.

"Q. Yes. Do you remember about when the latest discussion was prior to his death? A. I would think about four months before his death.

"Q. Tell us the occasion of that and what was said, will you? A. About the same thing; there was nothing specific said. It was just a form of the discussion that he had told us that the agreement was always that the Glauerts and Ernst Huning was to get his money. I mean, it was not a particular thing that was just said; it was a form of conversation.

"Q. And did she on more than one occasion discuss about how her money was to go, her part of the money? A. Yes. She said she could do as she pleased with her money, and, naturally, her money was to go to her side of the family."

She further testified that after Mr. Warmann's death, she often visited Mrs. Warmann and on occasions talked with her about her property. A part of her evidence on this follows:

"Q. Now, did Mrs. Warmann during any of those visits ever discuss with you her use of the property that Bill had owned and she had owned as an estate of the entirety where the deeds were in both their names? A. Yes.

"Q. What did she tell you? A. She told us that she could use the income of the property as long as she lived and that she was left Ten Thousand Dollars outright through Mr. Warmann's will, and she also told us that at any time that she needed money and that she needed money that she could sell a piece of property if necessary but that the—all of the property under Mr. Warmann's will must go to the Glauerts and to Ernst Huning, and she talked to me about that at least a half dozen times.

\* \* \* \* \* \*

"Q. (By Mr. Cox) Tell us what other discussions she had with you about Bill. A. She said that there had been an agreement made between she and Mr. Warmann of the disposal of the property through his will, and she said that she wanted to carry out his will under any circumstances, that she would not—would not feel that she could meet him in the next world if she did not carry out his wishes in disposing of his property, and this she told me at least a half dozen times, too.

"Q. Was there ever any discussion about her with you as to whether or not she and her husband kept their accounts and estates separate from each other so they knew what they had? A. Yes. They knew what was his and what was hers; and she would tell us of lending him her money in order to invest. She would get a kick out of it to know she was going to receive some interest on her money from her own husband and that interest money she said she would always buy something, a little out of the ordinary, just so she would have that as a remembrance.

"Q. With reference to whether or not such borrowed money was paid back to her, was there any discussion about that? A. She said she always got her money paid back to her. She said that was a good investment and would always get paid back.

"Q. With reference to the subject matter of using the income or rent or life estate, did she ever discuss that with you? A. Yes.

"Q. What did she say about the use of the property? A. Well, she said that there would be often times that she could not spend her money because she did not—she wanted her money to last her the rest of her life and that she wanted to take care of herself properly and that she would not spend money at different times that she —she would consider whether she should spend her money."

The evidence of Mr. and Mrs. Carter Brown, introduced in the trial of Glauert

v. Huning, supra, was offered in evidence in this case. These witnesses testified they had rented the property at 6900 Easton Avenue, sometimes referred to as the Kingsland Avenue property, from Mr. Warmann and they continued as tenants after his death. These witnesses further stated they wanted to purchase the property and asked Mrs. Warmann on numerous occasions to sell it to them; that they had a lawyer go to Mrs. Warmann in their behalf but that she steadfastly refused, saying the property had been given to Gus and it was not hers to sell. This evidence has no direct bearing on the issues in this case except that it indicates that Mrs. Warmann was accepting the disposition of the property made by her husband's will.

Defendants did not introduce any evidence except several exhibits, A, B, and C. These included the following: Exhibit A consisted of the report of a tax appraiser of the estate of Mr. Warmann which showed that the interest of the widow, Ida K. Warmann, was $10,749.04, and that of nine nieces and nephews was $113.49 each, and that of two nephews was $160 each. This exhibit also showed that the property in dispute in the present case was not included as a part of Mr. Warmann's estate. This exhibit further disclosed that Earl G. Smith acted as attorney for the estate. Exhibit B consisted of the application of August Glauert to be appointed as executor. Exhibit C was the order of discharge of the executor.

Defendants' principal contention briefed is that the evidence did not justify the trial court in entering a decree for plaintiffs. This contention was subdivided into a number of specific points. Let us first consider whether the evidence justified a finding that there was an agreement or understanding between Mr. and Mrs. Warmann to the effect that the property of each should ultimately descend to their next of kin; also that by this agreement the property held in their joint names was considered Mr. Warmann's property. We take into consideration the fact that they were married late in life and had no children; that each was possessed of a substantial amount of property; that the property belonging to Mrs. Warmann was kept separate by her as her own. In such circumstances, we ask, would it not be just, natural, and reasonable for each to desire that his or her property should go to his or her relatives? We think so. All the evidence tends to support the fact that such a desire was harbored by both Mr. and Mrs. Warmann. According to the evidence, they often mentioned that such was their agreement. Considering the circumstances of the parties, we think it is unreasonable to suppose that the intention was that all of the property should go to the wife's relatives. This is especially so in view of the fact that both Mr. and Mrs. Warmann regarded the Glauert children and Ernst Huning very highly. The record contains substantial evidence that the Warmanns did in fact have an agreement or understanding that Mr. Warmann's property, most of which was in their joint names, should go to his nieces and nephews and that Mrs. Warmann's property, which was kept separate and apart from her husband's, should go to her heirs.

Defendants say that the evidence did not show when such an agreement was made, nor its terms or the circumstances under which it was made. We hold that it is sufficient if the agreement was in fact made and that its terms were sufficiently definite to be enforced. Defendants say further that there was no evidence of any consideration or other benefit accruing to Mrs. Warmann under the alleged contract. It will be seen, however, that Mrs. Warmann accepted the provisions made for her by Mr. Warmann in his will, including the $10,000 special bequest. She also accepted a life estate in all of the property of Mr. Warmann, that which was in his name and that which was held as an estate by the entirety. A husband and wife may mutually agree to the disposition of their property and if they abide by that agreement, it is binding on their heirs or devisees. Such an agreement constitutes sufficient considera-

**132**

tion to support the contract. · See 41 C.J.S., Husband and Wife, § 89, p. 562, and § 91, p. 564; Hall v. Greenwell, 231 Mo.App. 1093, 85 S.W.2d 150, loc. cit. 155(4); Clark v. Clark, Mo.App., 228 S.W.2d 828, loc. cit. 832(4–6).

 Defendants also say that there was no evidence that Mrs. Warmann knew the financial condition of Mr. Warmann at the time of the alleged agreement. Sufficient answer to that contention is that the record shows everyone connected in a business way and all relatives, including Mrs. Warmann, knew of and often discussed the sale of the brickyard and that the sale price was $100,000. Defendants further contend that an oral agreement of this nature cannot be enforced because it is in violation of the statute of frauds. To support this, defendants cite Shaw v. Hamilton, 346 Mo. 366, 141 S.W.2d 817. In that case, 141 S. W.2d at pages 822–824(6, 7) (8), this court held that the evidence did not establish any certain agreement; that its terms were not established; that performance or part performance in reliance upon the contract was not shown. In the case before us, the evidence concerning the declarations made by both Mr. and Mrs. Warmann is not confusing· or inconsistent. All of the evidence pertaining to the existence of a contract tended to prove but one agreement or understanding, that is, that Mr. and Mrs. Warmann had agreed that the property of Mr. Warmann was to be left to his relatives, particularly the Glauert children and Ernst Huning, and Mrs. Warmann's property to her next of kin or as she might direct. The evidence was further that Mrs. Warmann treated the property which was the product of the money derived from the sale of the brick plant as belonging to her husband.

If Mrs. Warmann had rejected the will and taken her share· as a widow she might have received more value or less depending upon the circumstances. If she had re-

jected the will and taken a widow's share, at least a portion of the $10,000 bequest to her would have gone to plaintiffs in this case. In other words, Mrs. Warmann, after having consulted with a lawyer, accepted what her husband gave her by his will and she faithfully fulfilled her agreement with her husband, disclaiming to own a fee title to the property in controversy.

 Under the evidence, the trial court was justified in entering a decree for plaintiffs on the theory that Mr. and Mrs. Warmann treated the property in question as belonging to Mr. Warmann and that it should, after their death, belong to his next of kin or as he had provided for in his will. Milligan v. Bing, 341 Mo. 648, 108 S.W.2d 108, loc. cit. 109–111(1–4). In that case, this court reviewed the law applicable to a case of this nature. It was stated that parol evidence is admissible to show it was not the intention of the parties to create an estate by the entirety even though the deed so recited. It was also held that the parties questioning the deed had the burden to prove their case by clear and convincing evidence. In the case before us, defendants offered no evidence and plaintiffs' evidence, as above-indicated, clearly showed that an agreement existed and that the parties, that is, Mr. and Mrs. Warmann, treated the property not as an estate by the entirety but as being the property of the husband. The rule of law stated in the Milligan case, supra, may also be found in cases cited by the defendants. See Johnson v. Johnson, Mo.App., 268 S.W.2d 439, loc. cit. 442; Hiatt v. Hiatt, Mo., 168 S.W.2d 1087, loc. cit. 1090(7–9).

What we have said disposes of all the points briefed by the defendants. We rule that the trial court's decree is amply supported by convincing evidence and it is hereby affirmed.

All concur.