Milton G. ROSENFELD and Irving N. Rosenfeld, Irene Rosenfeld and Marcelle Rosenfeld, Appellants,

v.

GLICK REAL ESTATE COMPANY, Jeanette Leach, Paul Crosney, and The Prudential Life Insurance Company of America, a Corporation, Respondents.

No. 44940.

Supreme Court of Missouri.

Division No. 1.

June 11, 1956.

Rehearing Denied July 9, 1956.

Hyman G. Stein, James M. Douglas, St. Louis, for appellants, Joseph Nessenfeld, St. Louis, of counsel.

Chas. Claflin Allen, St. Louis, for respondents Glick Real Estate Co., Jeanette Leach and Paul Crosney, Allen & Allen, St. Louis, of counsel.

HOLLINGSWORTH, Judge.

This is an action to rescind the sale of certain real estate in the City of St. Louis, to cancel deeds conveying title thereto, to adjudicate title in plaintiffs, and for an accounting. The trial court found the issues in favor of defendants and dismissed the action, from which judgment plaintiffs have appealed.

The petition alleged that in June, 1950, plaintiffs employed defendants Glick Real Estate Company and Paul Crosney as their agents to endeavor to sell for the best price obtainable certain real estate owned by plaintiffs, situate at 5966 Easton Avenue in the City of St. Louis, for which services plaintiffs agreed to pay said defendants a commission upon sale to an acceptable purchaser for an acceptable price; that thereafter said defendants, through fraudulent transactions, false representations, willful failure to make full disclosure of material facts, and use of the name of defendant Jeanette Leach as their straw, secretly obtained title to said property; that in the process of obtaining title by the means aforesaid defendants Glick Real Estate Company and Crosney secretly procured a loan for the principal sum of $150,000 from defendant Prudential Life Insurance Company, secured by deed of trust on said property, which plaintiffs prayed be cancelled or, if it be found to be a valid lien, that just and equitable orders be made with respect thereto; and that defendants Glick Real Estate Company and Crosney had collected rents and profits from said real estate, for which an accounting was prayed.

The joint answer of all defendants admitted that Glick Real Estate Company and Paul Crosney acquired ownership of said real estate and procured the loan from the Prudential Life Insurance Company in the name of Jeanette Leach, who acted as a straw for Glick and Crosney, and denied all allegations of fraud or other misconduct on the part of each and all defendants. The joint answer further affirmatively alleged that throughout all of the transactions plaintiffs were represented by their attorneys and agents, Ben L. Shifrin and Louis Shifrin; that said attorneys had full knowledge of all of the facts; that prior to and at the time of the sale of the real estate by plaintiffs to defendants said attorneys knew that Glick Real Estate Company and Crosney were acquiring ownership thereof for their own account and not as agents, which knowledge was the knowledge of plaintiffs; that the Shifrins communicated their aforesaid knowledge to plaintiffs prior to the sale to Glick and Crosney; and that plaintiffs, with full knowledge, accepted the purchase price and approved the sale, by virtue of which they were now estopped to assert the claim herein made.

The judgment of dismissal, rendered after a lengthy trial and consideration of briefs, recited that the trial court was "of the opinion that in order for plaintiffs to prevail, the testimony of witnesses, Ben Shifrin and Louis Shifrin, would have to be disbelieved", and that the plaintiffs had failed to prove their case by the greater weight of the credible evidence and were not entitled to the relief prayed.

Plaintiffs Milton and Irving Rosenfeld are brothers, residing in the City of St. Louis. Their wives are made parties plaintiff solely because of their marital interest in the property here in question. Glick Real Estate Company is a corporation engaged in the real estate business in St. Louis and Eugene Glick is president thereof. Jeanette Leach was at the times herein mentioned an employee of Glick Real Estate Company. Paul Crosney is a lawyer and

real estate agent residing in New York. Prior to the times herein mentioned he had jointly engaged with Glick Real Estate Company in activities relating to real estate. Unless otherwise indicated, we will refer to Milton Rosenfeld and Irving Rosenfeld as though they were the only plaintiffs and to Glick Real Estate Company and Paul Crosney as though they were the only defendants.

Plaintiffs are experienced business men. In January, 1949, they organized Miltanirv Investment Company (hereinafter referred to as "Miltanirv"), the entire stock of which they owned in equal shares. Miltanirv took title to the property at 5966 Easton Avenue at the time of or soon after its organization. The property has a frontage of 45 feet on the south side of Easton Avenue and extends southward a distance of approximately 223 feet to an alley. The building on the property, formerly occupied as a funeral parlor, was then vacant. There is a garage to the rear of the building that opens onto the alley. Miltanirv leased the property to Werner-Hilton, Inc., a men's furnishing store, for a base annual rental of $17,500, under an agreement that Miltanirv would remodel the building according to lessee's specifications, and the lease would extend for a term of ten years after completion of the remodeling. The remodeling was completed in September, 1950. The garage was not included in the lease, but the lease gave lessee a five-year option to include the garage for an additional annual rental of $1,800 per year. That option becomes a factor in this controversy.

In May or June of 1950, Eugene Glick sought to interest plaintiffs in permitting Glick Real Estate Company to try to sell the property, suggesting that a buyer might more readily be found in New York than in St. Louis. Plaintiffs acquiesced in his proposal. On or about June 24, 1950, Miltanirv granted Glick Real Estate Company a fifteen-day option to purchase the property for the sum of $200,000 net. (Plaintiffs say the option was procured by Eugene Glick for the purpose of assuring his co-defendant Crosney that if a deal for the sale of the property was negotiated, plaintiffs would go through with it. Ben Shifrin, who drew the option as plaintiffs' attorney, said its purpose was only what it purported on its face to be. That option, however, was not exercised.)

About this time, Crosney found a prospective buyer in New York in the person of Henry Bermant. On June 28, 1950, plaintiffs and defendants met in the law offices of plaintiffs' attorneys, Shifrin & Shifrin. Crosney submitted a form of contract for the sale of the property by Miltanirv to Bermant for the price of $210,000. Plaintiffs were advised by Ben Shifrin that liquidation of Miltanirv and reinvestment of title to the property in plaintiffs prior to any sale thereof would be to their advantage from a tax standpoint. Pursuant to that advice, Ben Shifrin, at plaintiffs' direction, redrew the contract to recite that the plaintiffs, as the owners of the stock of Miltanirv, had succeeded to the title and were the sellers. (Such liquidation was completed and title was vested in plaintiffs prior to the sale of which plaintiffs complain.) That proposed contract provided for the sale of the property, subject to the Werner-Hilton lease, for $210,000, $10,000 of which amount was to be deposited as earnest money with Ben Shifrin upon execution of the contract by the buyer. The contract further provided that defendants were to be paid a commission of $10,000 as brokers and agents for plaintiffs; that "this contract may be assigned"; and that the contract should be void unless executed by all parties not later than July 10, 1950. As thus prepared, it was delivered to Crosney for submission to Bermant. Bermant refused to sign. Crosney began a search for another buyer and obtained from Ben Shifron, as attorney for plaintiffs, an extension of the time for acceptance from July 10 to July 20.

Crosney solicited one Charles Benenson as a prospective buyer. Benenson desired changes in the contract. He was represented by the New York law firm of Goldfarb & Fleece. Instead of writing a new contract, Goldfarb erased the name of Bermant from the contract submitted to Ber-

mant and inserted the name of Goldfarb's secretary, Etta Abramoff, as a straw for Benenson. Goldfarb then wrote and attached to the contract a three-page rider setting forth twenty-two new provisions, among which was Paragraph 9 that required plaintiffs to enter into a lease of the garage at $1,800 per annum, subject to Werner-Hilton's option to rent it. Another provision was that the contract would become valid if the sellers executed the rider and Ben Shifrin, as "escrowee", signed an escrow receipt for $10,000 appended to the bottom of the rider and delivered the instrument (consisting of the original contract, as amended, the rider and the attached "escrow receipt") to the buyer in New York on or before July 24, 1950. Etta Abramoff then signed the original contract (as amended) and the rider. The entire document, together with a check of Goldfarb & Fleece for $10,000 and a letter addressed to Ben Shifrin, was delivered by Goldfarb to Crosney, who, on July 18, 1950, mailed it to Glick Real Estate Company with instructions to get it signed and in the mail on the following day.

The agreement proposed by Goldfarb was submitted by Glick to plaintiffs at Ben Shifrin's office on July 20, 1950. Plaintiffs would not accept Paragraph 9 requiring them to take over the garage as lessees. At their direction, Ben Shifrin wrote a new Paragraph 9 which would give the purchaser the right to withdraw from the contract and the return of the $10,000 deposited as earnest money if Werner-Hilton failed to exercise its option to lease the garage within five days from July 20. This proposed new Paragraph 9, initialed by plaintiffs, was pasted over the original Paragraph 9 of the rider, and the document as thus changed was signed on the last page by plaintiffs and Ben Shifrin signed the escrow agreement. The proposed contract as amended by plaintiffs was then sent to Crosney for resubmission to Abramoff. In the letter of transmittal, Ben Shifrin, at plaintiffs' direction, advised Crosney of the change; that he, Shifrin, had signed the escrow agreement but was withholding deposit of the Goldfarb check until advised by wire that

the purchaser had approved the contract; that he was calling Glick's attention to the necessity of getting Werner-Hilton to exercise its option to lease the garage within five days; and that upon receipt of a wire from Goldfarb accepting the contract he would deposit the check and consider the deal closed.

On July 20, following the conference between plaintiffs and defendants at Ben Shifrin's office, Milton Rosenfeld left the city for a vacation of several weeks and within a day or two thereafter Ben Shifrin left on his vacation and was absent from the city until Labor Day.

Irving Rosenfeld testified: On Monday July 24, 1950, Julius Werner of Werner-Hilton, Inc., called him and said Werner-Hilton wanted to buy the property. Witness promised to call Werner on the following day and immediately called Shifrin's office to ascertain if the revised contract had been accepted by Abramoff. Upon learning of Ben Shifrin's absence, he inquired of Ben Shifrin's partner, Louis Shifrin, as to whether Abramoff had accepted the proposed contract. (Louis had not at that time had any connection with the matter insofar as witness knew. Both Ben and Louis Shifrin testified that before Ben left on his vacation he discussed the whole deal with Louis and advised Louis as to what had happened up to the time he was leaving.) Irving further testified that Louis said "he will protect me", to which Irving replied, "Louis, I have an opportunity to sell this property for more money. I don't want to be protected on the contract. If they haven't been signed, it would please me"; that Louis told Irving to come to see him that afternoon in his office; that at Shifrin's office, he met Louis Shifrin and Eugene Glick and was shown a telegram from Goldfarb, dated July 24, 1950, addressed to Ben L. Shifrin, reading: "Please return Goldfarb and Fleece check. Understand Glick will substitute own check. Please confirm receipt substituted check. Upon return our check and authorization by Glick will assign contract to Glick and Crosney. Thanks your courtesy."; that Glick thereupon informed him (Irving)

that he (Glick) was "taking over the deal"; that he (Irving) asked if "New York is out of the deal?"; that Glick replied, "Yes, they're out", and suggested the drawing of a new contract, which he (Irving) refused; that he (Irving) then said to Glick, "If New York is out, then I would like to go over and see Werner. Werner wants to buy the property. And since New York is out of the deal, I could get more money for the property. * * * That's exactly why I came over this afternoon, to find out if New York is out of the deal."; that Glick said "he has the deal now * * *, and I can't do anything about it"; that he (Irving) then told Glick that Werner-Hilton would buy the property for $210,000 and that "I will sell that property to Werner and I will give you $5,000 for a half commission. * * * Inasmuch as New York is out of this deal, that Mr. Crosney is out of the deal, and you will come out just the same as if the New York people bought the property"; that Glick agreed; that he (Irving) then went to see Werner while Glick waited at Shifrin's office; that Werner was willing to pay $210,000 for the property, but wanted to give back a second mortgage for part of the purchase price, to which Irving would not agree; that Werner wanted more time; that he (Irving) returned to Shifrin's office and reported to Glick his conversation with Werner; that Glick said "he would take $5,000 commission if Werner bought the property"; that on the evening of the same day Werner advised him (Irving) over the telephone that he would take the property and he and Werner agreed to close the deal at Shifrin's office on the next day; that thereupon he (Irving) called Glick and advised him that Werner was ready to close the deal; that Glick said, "I am sorry. I just called New York and I got a recommitment from my New York buyer."; that he (Irving) had no further information from any one until the deed to Jeanette Leach was executed on October 5, 1950, at Ben Shifrin's office; that he did not know Jeanette Leach or that she was the straw of Glick and Crosney, or that Glick Real Estate Company and Crosney were the purchasers; that at the time he signed the deed he did not know

that Abramoff had rejected the contract and that he assumed the grantee in the deed (Jeanette Leach) was the New York buyer.

On cross-examination, Irving Rosenfeld testified: Glick told him in the presence of Louis Shifrin that the New York purchaser was not going through with the deal; that Ben Shifrin returned in September and attended to the closing of the deal on October 5, 1950, as attorney for plaintiffs; that he signed the deed to Jeanette Leach in Shifrin's office; that plaintiffs were not told Glick and Crosney were the buyers; that in closing the deal a check of Glick Real Estate Company, dated October 5, 1950, for the sum of $18,523.53, payable to Milton G. Rosenfeld and Irving N. Rosenfeld was personally endorsed by plaintiffs; that at the same time a certified check of Paul Crosney dated September 29, 1950, payable to the order of Paul Crosney and by Paul Crosney endorsed "Pay to the order of Milton G. Rosenfeld and Irving R. Rosenfeld, in re purchase 5966 Easton Avenue, St. Louis, Mo." was also personally endorsed by plaintiffs; that at the same time Ben Shifrin showed plaintiffs a "closing statement", dated October 5, 1950, which recited a sale price of $200,000; that the aforesaid checks were not cashed by plaintiffs, but, at the direction of Ben Shifrin, went to an escrow agent to be used and accounted for after deduction of outstanding material bills and other properly deductible items.

On redirect examination, Irving said that he did not know at the time the deal was closed on October 5th that Crosney had been informed Abramoff would not sign the contract, nor that on July 27, 1950, Goldfarb, on behalf of the purchaser, had given Crosney a letter reciting that the assignment of Abramoff's interest in the contract to Crosney was without recourse, nor that Crosney had agreed to indemnify Goldfarb's client against liability in connection with Abramoff's signature on the contract.

Eugene Glick, called by plaintiffs, testified: Ben Shifrin had been attorney for

Glick Real Estate Company. for a number of years, did not represent it in this deal, and did represent plaintiffs; that on July 18th or 19th, Werner told witness he would exercise Werner-Hilton's option to lease the garage, but later refused to do so; that he (Glick) called and so advised Crosney in New York and Crosney said that perhaps Goldfarb's client would take the property without the garage; that he and Crosney also discussed buying the property on their own account, if Goldfarb's client would not approve the present contract; that following further communication with Crosney in which he (Glick) was advised Goldfarb's client would not accept the deal without the garage being rented, Glick told Louis Shifrin that he and Crosney would buy the property without the garage; that when Louis Shifrin received Goldfarb's telegram on July 24, 1950, suggesting substitution of Glick's check for $10,000 and expressing a willingness to assign the contract to Glick and Crosney, Louis Shifrin called Glick and advised him if he (Glick) would bring over his check for $10,000, Louis would have the purchase contract "signed over" to him; that on July 25th he (Glick) met with Louis Shifrin and Irving Rosenfeld in Shifrin's office; that at that meeting Glick told Irving Rosenfeld and Louis Shifrin the "New York people backed out of the deal and the deal was off"; that he and Crosney were going to buy the property and that he (Glick) was replacing the Goldfarb check with a Glick Real Estate Company check for $10,000, "without the garage being optioned"; that Louis Shifrin took the check and Irving made no protest; that after the Glick check was substituted, Irving Rosenfeld told Glick he could sell the property to Julius Werner for $210,000, and if permitted to do so, he would give Glick $5,000 and keep $5,000 for himself; that he (Glick) agreed and Irving left immediately to see Werner, telling Glick to await his return. Shortly thereafter, Irving returned and said Werner was willing to buy for $210,000 but wanted to give a second deed of trust for part of the purchase price, which was not satisfactory.

Glick further testified: That at the meeting of Glick, Irving Rosenfeld and Louis Shifrin on the 25th, Glick suggested the contract had become so bulky with riders and initials that a new contract would be more simple, to which Irving replied, "We don't bother with any more contract. Just let it alone"; that on the evening of the 25th, Irving called him and said Werner would buy the property and do his own financing; that he (Glick) told Irving he had called Crosney and advised him what had transpired; that he and Crosney had purchased the property and that he (Glick) had given his check, and was not free to make any commitments until he had conferred further with Crosney, who had indicated he was coming to St. Louis; that Irving was disappointed—sore; that he (Glick) met Milton Rosenfeld at Ben Shifrin's office after Milton's return from vacation and told him that he (Glick) and Crosney had bought the property without the garage option and that the assignment of the Abramoff contract to him and Crosney made them the purchasers of the property.

Paul Crosney, also called by plaintiffs, testified: He was a lawyer and practiced in New York since his admission to the Bar in 1932; that he has a LL.D. degree from New York University, a Ph.B. degree from Yale University and is experienced in the practice of real property law; that he was present in the office of Ben Shifrin on June 28, 1950, when plaintiffs instructed Ben Shifrin to handle the complete transaction; that they said, "You understand, what we want, Ben. We want $200,-000 net to us without any obligations on our part. * * * We are leaving everything in your hands, Ben."; that the New York buyer refused to accept the amendment proposed by Ben Shifrin in regard to the garage, but later that day (on July 24th) did accept the proposed contract on behalf of Glick and Crosney for the purpose of assigning it to them, subject to the consent of plaintiffs and the return of Goldfarb's $10,000 check; that the assignment was thereupon executed, but not delivered, awaiting plaintiffs' consent and the return

of Goldfarb's check; that on July 27, 1950, Goldfarb wrote and delivered to him (Crosney) a letter stating:

"* * * Following the execution of a contract by Etta Abramoff, acting for Mr. Benenson, the sellers notified us that they were required to modify the contract in a manner which proved unacceptable to Mr. Benenson.

"You then advised me that Mr. Glick of the Glick Real Estate Company of St. Louis, and yourself, had arranged with the seller's attorney, Ben L. Shifrin of St. Louis, to take over the purchaser's position in the contract, and to substitute Mr. Glick's check, representing the deposit, for the one originally forwarded by my firm under the contract executed by the said Etta Abramoff. I thereupon wired Mr. Shifrin and advised him that if he would return our firm check and if he would acknowledge to me that Mr. Glick had substituted his own check, I would assign Miss Abramoff's interest in the contract to Mr. Glick and yourself. This morning, Mr. Shifrin returned our firm check in the mail and acknowledged that he had received the check of Mr. Glick. Accordingly, I am handing you herewith the original proposed contract executed by Miss Abramoff and the sellers, containing the provision unacceptable to our client, together with an assignment thereof executed by Miss Abramoff to Eugene Glick and yourself, without recourse to Miss Abramoff in any event whatsoever, with the understanding there will be no liability on the part of Miss Abramoff or Mr. Benenson in connection therewith.

"I will ask you to agree with me and the persons I represent, by your signature below, that you will assume full responsibility for the proper use of said contract, and the assignment thereof, and that you will indemnify me and my said clients of and from any claim, liability or expense in connection with the execution of said contract by Etta Abramoff, and the delivery of said contract and the assignment thereof to you. Your signature below will further acknowledge that neither my clients nor I received any consideration for the foregoing, and that the delivery of said contract and the assignment is wholly gratuitous and done as a convenience to you.

"Very truly yours,
"SSG:SK            Stanley Goldfarb.
"I agree to the foregoing and acknowledge receipt of said contract and the assignment thereof.

"_____
"(Paul Crosney)"

Crosney signed the agreement at the bottom of the letter and returned it to Goldfarb and received from him the assignment reading as follows:
"For Value Received, I, Etta Abramoff, do hereby assign, transfer and set over unto Eugene Glick and Paul Crosney all my right, title and interest in and to a certain contract of sale dated June 28th, 1950, between Milton G. Rosenfeld and Irving N. Rosenfeld, as Sellers, and myself as Purchaser, relating to premises on Easton Avenue, St. Louis, Mo., together with the deposit paid thereunder.
"This assignment shall be without recourse to the assignor.
"Dated, July 24, 1950.     Etta Abramoff"

Crosney further testified that, having learned Ben Shifrin was on his vacation, he wrote Louis Shifrin on July 27, 1950, advising him in regard to the property "that the contract of sale in re the above premises, dated June 28, 1950, between Milton G. Rosenfeld and Irving N. Rosenfeld, as sellers, and Etta Abramoff, as purchaser, has been duly assigned to Eugene Glick and the undersigned. I shall be in St. Louis on next Tuesday and will deliver to you an executed copy of the contract and the assignment." (The letter was admitted in evidence.); that upon arrival in St. Louis, he showed Louis Shifrin that the amended Paragraph 9 as proposed and attached to the sales contract was still pasted thereon and that since he and Glick had agreed to waive the provision entirely, it should be stricken out and the fact of its being so stricken should be "initialed" by him and Shifrin, which they then and there did;

that he also suggested to Louis Shifrin that the contract should be changed to show a purchase price of $200,000 instead of the recited price of $210,000; that Shifrin said it would not be necessary, "We will close on the basis of $200,000 net"; that on the same date Louis Shifrin gave Crosney a letter in which he (Shifrin) acknowledged receipt of the assignment of the contract to Glick and Crosney and in which letter Shifrin acknowledged receipt "of check of Glick Real Estate Company, * * *, in the sum of $10,000, which is accepted as earnest money under the terms of the above mentioned contract, and is accepted in lieu of previous check submitted by Attorneys for Etta Abramoff:" (Louis Shifrin's letter was admitted in evidence.)

Crosney admitted that after the property was deeded to Jeanette Leach, as straw for defendants, she, as such straw, thereafter obtained a loan of $150,000 from the Prudential Life Insurance Company; and that during the negotiation of that loan, Crosney represented in writing to the Company that defendants had paid "not less than $215,000 for the property". (He also testified that the insurance company's representatives were present when the sale was finally closed and had full knowledge that he and Glick paid only $200,000 for the property.)

Milton Rosenfeld testified: He is president of the Western Garment Company, which manufactures women's clothing; that Ben Shifrin was attorney for Western Garment Company, Miltanirv, and represented both plaintiffs and Glick Real Estate Company; that Louis Shifrin was never his attorney; that when he first conferred with Glick at Ben Shifrin's office in regard to the Easton Avenue property, Ben announced to both of them that he represented both plaintiff's company and Glick Real Estate Company; that he, Milton, thereby understood Ben Shifrin represented both him and Irving as well as Glick in this matter; that after the rider proposed by Goldfarb was amended in Ben Shifrin's office on July 20, 1950, and sent to Goldfarb, witness left on his vacation, from which he returned in the latter part of August; that he had no information from any person as to who was buying the property between the date of July 20, 1950, and the final closing date of October 5, 1950, at which time it was deeded to Jeanette Leach; that in January or February, 1951, Gene Glick said something that caused him to rush over to Ben Shifrin's office, whom he failed to see; that he then ascertained from the city records that Jeanette Leach had deeded an interest in the property to Crosney, and then knew "that something rotten had happened"; that he called Ben Shifrin and was advised by Ben that "the instrument provided he had a right to assign. It was his opinion as a lawyer. That's why I didn't question it."

On cross-examination, Milton testified: He was a lawyer but had not practiced since 1925; that Ben Shifrin had been his lawyer for 25 years, but had no authority to take any important action without first consulting witness; that the Easton Avenue property was purchased in 1949 for $72,000 and some $70,000 of improvements were thereafter made; that shortly after witness' return from vacation, Irving Rosenfeld told him Abramoff was "going through with the deal"; that Ben Shifrin received the net amount due plaintiffs when the deal was finally closed and all adjustments had been made and, at witness' direction, paid it over to witness' auditor, Louis Tiger.

Louis Shifrin testified in behalf of defendants: Before Ben Shifrin went on his vacation in 1950, he told Louis about the Easton Avenue property matter so that Louis could "carry on" in Ben's absence. On Saturday, July 22nd, Louis went with Eugene Glick to the office of Mr. Steinberg, attorney for Julius Werner, to ascertain if Werner was going to exercise the option to rent the garage on the Easton Avenue property. They received no satisfactory answer to their inquiry. On July 25th, Irving Rosenfeld and Eugene Glick came to the Shifrin office. The Goldfarb telegram was read. There was a discussion in the presence of Irving in which Glick said he and Crosney would become purchasers and would substitute their check for the Goldfarb check.

Louis further testified that: "He (Irving Rosenfeld) asked whether or not New Yorker (Goldfarb's client) could compel him to go through with the contract. * * * And I told him that the New Yorker could waive the $1,500-$1,800 rental provision and accept the deal without the rental provision, because that was a matter the purchasers had a right to waive, if they cared to"; and that Glick said nothing; that Glick said he and Crosney would not insist upon the garage option; that Glick delivered to Louis Shifrin Glick Real Estate Company's check for $10,000 as earnest money which Louis accepted and deposited to the account of Shifrin & Shifrin; that Irving said to Glick, "Suppose you sell this to Werner for $210,000"; that Gene Glick said to Irving, "You go out and see if you can sell it to Werner and if you can, I will give you half of the profit I make on it"; that Irving thereupon went to see Werner but could not make a deal with him. Louis Shifrin then identified and the court admitted in evidence a daily time card of Shifrin & Shifrin headed "Miltanirv Investment Company", which had listed thereon, among other listed items, the following: "L.S.—7/25/50—Conference with Gene Glick and Irving Rosenfeld and agreement reached. Call by Irv on Werner and then returned with no deal from Werner. 1-¾ hr." On July 26, 1950, Louis Shifrin sent Goldfarb a telegram advising: "Your check being returned today. Glick check received." On August 1st, Louis wrote Crosney accepting the $10,000 check as earnest money paid under the contract assigned to Glick and Crosney.

Ben Shifrin testified in behalf of defendants: He had practiced law in St. Louis since 1911 and Louis Shifrin was one of his partners; that he (Ben) had represented Milton Rosenfeld and his company for 25 years and as such organized and was counsel for Miltanirv; that he (Ben) was the principal counsel but Milton at times consulted the other partners; that Louis Shifrin handled the legal details of the purchase of the Easton Avenue property by Miltanirv in 1949; that when Milton Rosenfeld first asked him (Ben) to draw the "option", Ben informed him, "I want you to know I represent Glick Real Estate Company in some of their general matters, and with that understanding I will go ahead and draw it up"; that Milton told him to go ahead and take care of the matter; that upon return from vacation he (Ben) discussed the Easton Avenue deal with Louis Shifrin and Louis told him "the deal had been changed around so that Glick and Crosney were the purchasers, because the people in New York hadn't agreed to the change, which I (Ben) insisted on in connection with Werner and Hilton; that the Goldfarb check was either returned or to be returned—I don't know which; and that Glick had deposited his own check for $10,000; and the deal was considered a $200,000 net deal"; that he (Ben) went through the files and familiarized himself with everything that happened during his absence; and that on September 19, 1950, he (Ben) wrote Eugene Glick and Paul Crosney:

"Gentlemen:

"The undersigned, owners of property at 5966 Easton Avenue, do hereby notify you that they are ready to close the deal on or before October 5, 1950, for the property known as 5966 Easton Avenue, in accordance with the terms of the contract between us for the sale of said property. This notice being intended as a fifteen (15) days' notice as provided for in said contract.

"Yours very truly,
"Ben L. Shifrin
"Attorney for Milton and Irving Rosenfeld."

Ben Shifrin further testified that he handled the closing of the deal for plaintiffs; that prior to the closing, Irving Rosenfeld came to his office to sign and deliver the deed (Milton had signed the deed in New York) to him to enable him to close the deal; that at that time Irving Rosenfeld told him that after Glick had bought the property, Glick promised Irving that if Irving would sell the property to Werner, Glick would give Irving one-half of the commission; that he (Ben Shifrin)

thereupon related to Irving that he understood from Louis that Glick was only to pay the commission if Irving sold the property that day, which Irving had failed to do; and that "we (Ben Shifrin and Irving) discussed that problem before the deal was closed."

"Q. Did he (Irving) tell you not to deliver the deed to Glick? A. Quite the contrary. He gave me the deed to deliver and close the deal."

Ben Shifrin further testified that the deed was made to Jeanette Leach, whom he knew to be a straw for Crosney and Glick; that after the deal was closed, Ben Shifrin forwarded to Milton Rosenfeld's auditor a complete breakdown of the transaction, including a closing statement prepared by Glick Real Estate Company, showing the purchase price of $200,000, the credit for $10,000 earnest money, and other deductions on account of taxes, unearned insurance premiums, material bills, etc.; and that after the deal was closed and before the proceeds had been distributed, Milton, while in Ben Shifrin's office, said to Ben that he thought Glick got a bargain in the purchase of the property, to which Ben replied, "Milt, you didn't lose anything there", and that Milton said, "I guess you are right. You never go broke making a profit."

■ There is little, if any, controversy as to the substantive law governing the rights and liabilities of the parties herein. "The rule is universal that an agent authorized to sell property for another cannot himself be the purchaser, unless he discloses fully to his principal that he is the purchaser, revealing everything within his knowledge relating to the transaction." Benson v. Watkins, 313 Mo. 426, 285 S.W. 407, 408 [1]; Utlaut v. Glick Real Estate Company, Mo.Sup., 246 S.W.2d 760, 763. See also Restatement of the Law, Agency, §§ 388–390, pp. 870–882. "An agent is not allowed to put himself in a position antagonistic to his principal, or speculate in the subject of the agency. The most open, ingenuous, and disinterested dealing is required of him." Holt v. Joseph F. Dickmann Real Estate Co., Mo.App., 140 S.W.2d 59, 64 [5, 6];

Utlaut v. Glick Real Estate Co., supra. But "the existence of an agency relationship does not of itself forbid any and all transactions between the agent and his principal; and if the agent deals fairly and openly with his principal, and the latter, with full knowledge  *  *  *, freely sanctions the agent's purchase of the property on his own account  *  *  *", the transaction is valid. Kirkwood Trust Co. v. Joseph F. Dickmann Real Estate Co., Mo. App., 156 S.W.2d 54, 59. See also Stephenson v. Pfeiffer, Mo.App., 263 S.W.2d 218, 221; Restatement of Agency, § 390, p. 877.

■ The questions for decision are (a) whether defendants made fair and full disclosure to plaintiffs of all facts pertaining to the refusal of Goldfarb's client to accept the proposed amendment of Paragraph 9 of the rider, and (b) whether plaintiffs knowingly and voluntarily consented to the purchase of the property by defendants. Where, as did the agents in this case, the agent affirmatively pleads that the principal was advised and knew that the agent was acquiring the property on his own account and not as agent and that the principal with full knowledge of such fact accepted the purchase price and ratified and confirmed the sale, the burden of proof is upon the agent to prove such knowledge and ratification. Meek v. Hurst, Mo.Sup., 219 S.W. 619, 620 [1–3]; Restatement of Agency, § 389, Comment e, p. 876, § 390, Comment f, p. 882; Williams v. Bolling, 138 Va. 244, 121 S.E. 270, 273 [1, 2]; 8 Am.Jur., Brokers, § 213, p. 1112; 12 C.J.S., Brokers, § 51, p. 119; Silver v. Logue, 127 Cal.App. 565, 16 P.2d 183, 185; Berkeley Sulphur Springs v. Liberty, 162 A. 191, 192, 10 N.J. Misc. 1067; Bell v. Scudder, 78 Cal.App.2d 448, 177 P.2d 796, 800–801.

■ In determining the questions presented, we review the evidence de novo, make our own findings and enter the judgment which we conclude should have been rendered in the first instance, giving substantial deference, however, to the finding of the chancellor on disputed issues of fact presented by the oral evidence of witnesses personally appearing before him. Glauert

v. Huning, Mo.Sup., 266 S.W.2d 653, 662; Nichols v. Wirts, Mo.Sup., 270 S.W.2d 801, 805.

As stated, the chancellor believed the testimony of the Shifrins and plaintiffs frankly admit they "do not in any way question either the motives or the good faith of the Shifrins", and that "the evidence does not warrant such a contention." Plaintiffs' position is that "[e]ven assuming defendants could relieve themselves of their obligation to disclose fully to their principals all pertinent facts by making such a disclosure to the Shifrins (a proposition which we do not concede), there is no testimony given by either of the Shifrins from which the court could reasonably find that all of the important facts had been revealed to either of them." We cannot agree.

In view of the conceded integrity of the Shifrins and the trial court's acceptance of their testimony, it is logical to proceed upon the theory that to the extent their testimony corroborated and was consistent with the testimony of defendants and inconsistent with the testimony of plaintiffs,—to that extent the testimony of defendants may also be taken as true in preference to that of plaintiffs, unless good reason otherwise appears for finding to the contrary. Space will not permit an extended discussion of the conflicting testimony. A brief review of a few of the highlights will indicate the basis of our conclusions.

On July 24th, Louis Shifrin was advised by the telegram of Goldfarb that upon substitution of Glick's earnest money check for Goldfarb's earnest money check Goldfarb's client "will assign contract to Glick and Crosney". On July 25th, Irving Rosenfeld and Glick met in the Shifrin office, where the telegram was discussed. During that discussion, according to Louis Shifrin's testimony, Irving was fully advised that Glick and Crosney would substitute their check for Goldfarb's and would become the purchasers. On that day, Louis Shifrin made an entry on his books, "Conference with Gene Glick and Irving Rosenfeld *and agreement reached.* Call by Irv on Werner and then returned with no deal from Werner." On the next day, July 26th Louis Shifrin wired Goldfarb, "Your check being returned today. Glick check received." There can be no question that at this stage of the proceedings Louis Shifrin understood that on July 25th Irving Rosenfeld was fully advised of the proposed substitution of Glick and Crosney as purchasers and that such substitution was to be accomplished by the assignment of the proposed contract by Goldfarb's client to Glick and Crosney. We will not here review Glick's testimony in detail, but he did definitely testify that both Irving Rosenfeld and Louis Shifrin were fully informed that the "New York people backed out of the deal and the deal was off", and Glick and Crosney were replacing the Goldfarb check with their own, and that Irving agreed that Glick and Crosney be substituted (by means of assignment) for Goldfarb's client. The testimony of Louis Shifrin is corroborative of the testimony of Eugene Glick and is inconsistent with the testimony of Irving Rosenfeld as to what happened and what was agreed to on that occasion.

Ben Shifrin's testimony was that upon his return from vacation he learned from Louis Shifrin that "the deal had been changed around so that Glick and Crosney were the purchasers, *because the people in New York hadn't agreed to the change"*; and that when Irving came to his office to sign the deed he and Irving discussed the matter of Irving's disagreement with Glick as to Irving's right to a commission on account of getting Werner's agreement to buy the property and that after he had fully informed Irving as to his (Ben's) understanding of the matter, Irving directed him to deliver the deed; and that after the deal was closed, but before the money was distributed, Milton Rosenfeld stated his belief *that Glick got a bargain in the purchase of the property* and when reminded that he (Milton) had sustained no loss, said, "I guess you are right. You never go broke making a profit." This testimony, together with the testimony and records showing the endorsement by plaintiffs of Glick's and Crosney's checks given as a part of the purchase price and other testimony and doc-

**874**

umentary evidence too lengthy and tedious to here repeat, is corroborative of defendant's testimony and inconsistent with the testimony of Irving and Milton that they did not know defendants were the purchasers until early in 1951.

But plaintiffs strenuously insist that when Goldfarb's client rejected the last proposal made by Ben Shifrin, the proposed contract terminated and any purported assignment was void. We do not decide the point because we deem it immaterial. The crucial fact is that plaintiffs did have full knowledge that the purchaser named in the contract had refused to approve it and was assigning it to Glick and Crosney solely to permit them to become the buyers; and that, so knowing, and after seeking and obtaining advice of counsel (regardless of whether that advice was sound or unsound), plaintiffs voluntarily sold the property to defendants.

Neither do we deem it material, if true, that neither Glick nor Crosney expressly advised plaintiffs that the assignment was without consideration, without recourse, and was conditioned upon an agreement on the part of Crosney to indemnify the assignee against any liability thereunder. As stated, plaintiffs and their counsel were advised of the essential fact that the New York purchaser had "backed out" and defendants were assuming his position under the contract and waiving the garage option. We are not convinced that a gratuitous assignment of the contract without recourse and under an indemnity agreement (as any cautious gratuitous assignor could well insist upon) constituted any material fact which, if known to plaintiffs or their attorneys, would have caused them to act differently. Indeed, it would seem that the secret payment of a valuable consideration by Glick and Crosney for the assignment, under the circumstances here in evidence, might more reasonably be considered an indicia of fraud than an acceptance of the assignment without consideration.

We are convinced that plaintiffs knew all of the material facts and with the advice and guidance of admittedly able and honest counsel voluntarily sold their property to defendants. They cannot now complain. Restatement of Agency, § 390, p. 877; Kirkwood Trust Company v. Joseph F. Dickmann Real Estate Co., Mo.App., 156 S.W.2d 54, 59 [4, 5].

The judgment, being for the right parties, should be and is affirmed.

All concur.