Joseph FRAGER, Plaintiff-Appellant,

v.

Melvin H. GLICK, McKnight Heights, Bon Hills, Oak Estates, Melvin H. Glick & Co., G. S. Homes, Inc., a Corporation, Melvin H. Glick & Co., Bildors, Inc., a Corporation, and Melvin H. Glick & Co., Realtors, Inc., a Corporation, Defendants-Respondents.

No. 47784.

Supreme Court of Missouri, Division No. 1.

June 12, 1961.

Ackerman, Schiller & Lake, Paxton H. Ackerman, Clayton, for appellant.

Shifrin, Treiman, Agatstein & Schermer, St. Louis, for respondents.

HOLMAN, Commissioner.

Plaintiff instituted this action in an effort to recover certain real estate commissions totaling $9,175.77. Defendants filed a counterclaim (based upon the alleged fraud of plaintiff in the sale of certain real estate) in which they sought actual and punitive damages totaling $80,000. A trial resulted in a verdict for plaintiff upon his claim in

the amount sued for, with interest, all of which totaled $10,962.56. The verdict was also in favor of plaintiff on defendants' counterclaim. Thereafter, the trial court sustained the defendants' motion for new trial both as to plaintiff's claim and defendants' counterclaim for the reason "that the verdict of the jury was against the weight of the evidence and against the law especially as to prejudicial instructions number 7, 12 and 14 when considered with other instructions in the case." Plaintiff has appealed from that order.

For a number of years Melvin H. Glick conducted extensive operations in residential and commercial developments in St. Louis County. To a large extent it was his policy to organize a separate corporation or partnership in conducting the business of developing each new subdivision. He owned or at least controlled each of those concerns. A long-time friend, David Stiffelman, was interested substantially in some of the projects. Melvin's brother, Jerry, also had an interest in some of the developments.

A number of the concerns organized by Melvin are defendants herein. In that connection defendants admitted in their answer that "the business activities and assets of the defendants upon behalf of which this answer is filed, and other persons and corporations, were commingled and exchanged to such an extent as to result in a hodge-podge as alleged by plaintiff and to constitute all of these defendants and other persons and corporations co-venturers each with the other."

In the latter part of 1952 plaintiff was employed by the Glick organization as their only salesman. He was to have the exclusive right to sell the houses in their subdivisions and would receive a certain commission (usually from $250 to $400) for each house sold. At the beginning his drawing account was $100 per week. According to the testimony of Melvin, plaintiff "started off with a bang," was an "excellent salesman, our top salesman." He was soon earning commissions which would average about $25,000 per year, and by December 1954 his drawing account was $400 per week.

During 1953 and 1954 the Glick organization grew rapidly. Plaintiff had become sales manager and had 11 or 12 salesmen under his control and there were about five girls in the office.

In December 1954 Melvin came to the conclusion that plaintiff should be compensated under a different arrangement. This resulted from the fact that the other salesmen were complaining that plaintiff was too much competition for them. Melvin had several conferences with plaintiff which culminated in an oral agreement made at a conference on December 28, 1954. A memorandum of the conference was prepared and signed by Melvin and was delivered to plaintiff who retained it without objection but did not sign it.

The new agreement as expressed in the memorandum provided that plaintiff was no longer to receive sales commissions but would be compensated by receiving 10% of the net profits of the various operations conducted from the Glick office. The memo also states that the "drawing account for Joe Frager will be at the rate of $500.00 a week. * * * Regarding extra draws that Joe Frager may want, this can be arranged by a conference between myself and Joe Frager. Any commissions that Joe Frager has earned up to January 1, 1955, on older property or the subdivisions, he keeps himself; but anything that he sells after January 1st will go under this new arrangement." In his testimony plaintiff conceded that the memo expressed the agreement "in substance, but particulars were left out." He also stated that the $500 weekly payment was referred to in the conversation as a salary and not as a drawing account. It was admitted by the defendants that on December 31, 1954, plaintiff had a credit of $17,507.02 in his drawing account and hence defendants were indebted to him in that amount. Plaintiff

alleged that thereafter defendants made payments to him on account thereof as follows: April 22, 1955, $2,500; July 28, 1955, $3,500; September 19, 1955, $1,500; and January 10, 1956, $3,000. It is claimed by plaintiff that the balance of $7,007.02 of said stated indebtedness is owed to him by defendants.

In July 1955 plaintiff's weekly check was reduced to $400. On May 27, 1956, Melvin suffered a coronary thrombosis and was in the hospital until July 10. He remained at home for more than a month after his release from the hospital and for several weeks thereafter spent only an hour or two in the office every few days. After Melvin entered the hospital it became apparent that the financial condition of the Glick operations was in a "precarious" state and that the subdivisions were suffering very severe losses. Because of that situation plaintiff made a temporary arrangement with Melvin's attorney, in July 1956, whereby he was again placed on a commission basis and his drawing account was reduced to $200 per week. Plaintiff was discharged in September 1956. In this suit he claims a balance due of $2,168.75 upon commissions alleged to have been earned during the last nine weeks of his employment.

There was evidence to the effect that there were no net profits resulting from the Glick operations after the new compensation arrangement between plaintiff and Melvin became effective (January 1, 1955). There was testimony by a C. P. A. employed in the Glick office that on March 15, 1956, plaintiff was "overdrawn" $20,950.78. The situation did not improve during the remainder of the time plaintiff was employed by the Glick organization.

We will first consider contentions relating to plaintiff's claim. As we have indicated, it is plaintiff's theory in this case (1) that under the agreement of December 28, 1954, he was, in any event, entitled to collect the balance then in his drawing account, i. e., $17,507.02; (2) that the week-ly payments he received from January 1, 1955, to July 1956, constituted a salary; and (3) that defendants are indebted to him for the amount by which the commissions earned during the last nine weeks of employment exceeded his $200 per week drawing account. To the contrary, it is the theory of defendants that plaintiff had a drawing account throughout the entire period of his employment and that the only changes resulting from the agreement of December 1954 were that the weekly draw was increased to $500 and the drawing account was thereafter to be credited with a percentage of the net profits of the Glick operations instead of sales commissions earned by plaintiff. Under that theory the payments made to plaintiff after January 1, 1955, would have exhausted the balance in the drawing account on that date. The instructions given by the court submitted plaintiff's claim, and defendants' defense thereto, substantially according to the theories herein outlined.

Plaintiff here contends that the trial court erred in sustaining defendants' motion for new trial, as to plaintiff's claim, on the ground that the verdict was against the weight of the evidence because there was no substantial evidence to support the defense interposed by defendants and hence the action of the court was arbitrary and constituted an abuse of discretion.

"The trial court is vested with an inherent and broad discretion in granting one new trial upon the ground the verdict and judgment are against the weight of the evidence. Albert J. Hoppe, Inc. v. St. Louis Public Service Co., Mo.Sup., 235 S.W.2d 347, 349; * * * Section 510.330 RSMo 1949, V.A.M.S. And its ruling upon that ground will not be disturbed, except in case of manifest abuse. Dye v. St. Louis-San Francisco Ry. Co., 361 Mo. 331, 234 S.W.2d 532, 534. * * * The rule is sometimes expressed by saying 'that the granting of a new trial by the trial court will not be interfered with on appeal where there is substantial evidence to sustain the

trial court's view, or, putting it another way, when there is substantial evidence to support a verdict for the party to whom a new trial is granted.' Walsh v. Southwestern Bell Tel. Co., 331 Mo. 118, 131, 52 S.W.2d 839, 845." Dawson v. Scherff, Mo.Sup., 281 S.W.2d 825, 831.

Although stated in different language it is obvious that plaintiff's real contention is that he is entitled to recover the amount sued for as a matter of law. There are two reasons why we fail to agree with that contention. The first is that defendants did not admit that plaintiff earned the amount of commissions claimed during the last nine weeks of his employment and hence there was a jury issue concerning his right to recover the balance of $2,168.75 alleged to be due upon that item. Secondly, we are of the opinion that the evidence relating to the agreement of December 28, 1954, would reasonably support a jury finding in accordance with defendants' theory of defense.

█ Plaintiff's contention is based primarily upon the fact that defendants admitted that he had a balance of $17,507.02 in his drawing account on December 28, 1954, and that the last paragraph of the memo of that date contained the provision that "any commissions that Joe Frager has earned up to January 1, 1955, on older property or the subdivisions, he keeps himself; but anything that he sells after January 1st will go under this new arrangement." Considered alone (without reference to the other parts of the agreement or other testimony) the first clause of the quoted provision would seem to provide that plaintiff would receive the amount then in his drawing account without regard to future payments or credits. However, when the provision is considered in connection with the evidence as a whole, we do not think the stated conclusion is compelled. In that connection it should be noted that plaintiff does not contend that the memo constituted the contract between himself and defendants. However, it was offered by defendants and admitted as evidence of the oral agreement and defendants contended that it contained said agreement. In his testimony Melvin denied that there had been any mention of salary in the conversation, and as to the balance in plaintiff's drawing account on January 1, 1955, stated his understanding "that the monies that he drew after this period January 1, 1955, were to apply first to the monies owed him in commissions prior to January 1, '55." Melvin also stated that the extra payments made to plaintiff on April 22, 1955, July 28, 1955, September 19, 1955, and January 10, 1956, were "extra draws" as provided in the memo and were not necessarily payments on the balance in plaintiff's drawing account ($17,507.02) on January 1, 1955.

The memo contained several provisions to the effect that on sales made by plaintiff after January 1, 1955, the commission he would normally receive would be credited to the assets of the Glick office. In view of those provisions the last paragraph of the memo could reasonably be interpreted as an effort to make it clear that commissions earned by plaintiff before January 1, 1955 (and unpaid), would not be credited to the assets of the office (remain to plaintiff's credit) while those earned afterwards would be so credited.

The foregoing indicates our view that the court properly submitted to the jury as a condition for a defendant's verdict the finding that the memo contained the agreement verbally entered into on December 28, 1954, and "that it was the mutual intention of the parties as expressed in said memorandum agreement, and as evidenced by their conduct with respect thereto thereafter that payments made to plaintiff under said memorandum agreement were to apply against credits due him, including the aforesaid sum of $17,507.02, and that such drawings exceeded the aforesaid amount."

Since plaintiff was not entitled to recover the amount of his claim (verdict) as a matter of law (there being substantial evi-

dence to support the defense) it may not be said that the order granting a new trial on his claim constituted a manifest abuse of discretion and hence that order should be affirmed. In view of that conclusion we need not consider the question concerning error in giving Instruction No. 7 which related to plaintiff's claim.

■ We will next state the facts out of which defendants' counterclaim arose. Melvin Glick testified that in the spring of 1955 he purchased a tract of land on Olive Street Road called Rainbow Tourist Court for $36,500; that on May 16, 1955, the property was deeded to him and his wife; that on the same date they signed a note and deed of trust describing the property, and immediately thereafter executed a quit-claim deed conveying it to Olivette Shopping Center, Inc. The last-named corporation is not a defendant in this case. Melvin, however, testified that his wife had no financial interest in the property; that Olivette paid nothing for the property and was just a "title holder for the property"; that at trial time he owned all the stock of Olivette.

In June 1956 (while Melvin was in the hospital) it became apparent to those in charge of the Glick office that they needed to obtain a considerable amount of money. At that time Jerry Glick gave plaintiff (and two other office salespersons) a list of several properties (including Rainbow Court) which should be sold. Plaintiff negotiated the sale of the property in question to Sye Bramoweth for $35,000.

Plaintiff testified that when he took the signed contract back to Bramoweth he (Bramoweth) offered to let him "go in on the property" if he would pay $1,250, the balance of the earnest money; that Bramoweth would arrange the financing. Plaintiff testified further that he discussed the proposition with Mr. Stiffelman in the Glick office who advised him against it because "he didn't think it was a good deal"; that he nevertheless accepted the offer of Mr. Bramoweth and gave his check for the balance of the earnest money; that title to the property was taken in the name of Bramer Development Corporation, which he and Bramoweth had organized with each owning one half of the shares of stock; that the property was sold during 1957 and he made a net profit of approximately $5,000. Plaintiff also testified that he told both Melvin and Jerry Glick about his interest in the "deal" before the sale was consummated by delivery of the deed.

Mr. Stiffelman testified that plaintiff discussed with him the advisability of taking an interest in the property. He stated on cross-examination that he had no financial interest in the property. Mr. Bramoweth corroborated plaintiff's testimony to the effect that he did not offer plaintiff an interest in the property until after the contract of purchase had been signed.

The property was conveyed to Bramer by warranty deed dated August 10, 1956. Melvin executed the deed as president of Olivette. It was Melvin's testimony that he first learned of plaintiff's interest in the property about September 1, 1956, when he read in an old issue of the "St. Louis Countian" that plaintiff was one of the incorporators of Bramer Development Corporation. Jerry Glick testified that he did not know of plaintiff's interest in the property until his brother Melvin told him in September 1956.

In their counterclaim defendants alleged that "in violation of his fiduciary duty as agent of defendants, plaintiff concealed from these defendants the fact that he had a beneficial interest in the purchase of said property; * * * that such concealment was willful, deliberate and fraudulent and in breach of his fiduciary relationship and obligation to defendants as their agent."

■ The rules applicable to the issues raised by the foregoing charges are well settled. " 'The rule is universal that an agent authorized to sell property for another cannot himself be the purchaser, unless he discloses fully to his principal that he is the

**390**

purchaser, revealing everything within his knowledge relating to the transaction.' Benson v. Watkins, 313 Mo. 426, 285 S.W. 407, 408 [1]; Utlaut v. Glick Real Estate Co., Mo.Sup., 246 S.W.2d 760, 763. See also Restatement of the Law, Agency, §§ 388–390, pp. 870–882. 'An agent is not allowed to put himself in a position antagonistic to his principal, or speculate in the subject of the agency. The most open, ingenuous, and disinterested dealing is required of him.' Holt v. Joseph F. Dickmann Real Estate Co., Mo.App., 140 S.W.2d 59, 64 [5, 6]; Utlaut v. Glick Real Estate Co., supra. But 'the existence of an agency relationship does not of itself forbid any and all transactions between the agent and his principal; and if the agent deals fairly and openly with his principal, and the latter, with full knowledge * * * freely sanctions the agent's purchase of the property on his own account * * *,' the transaction is valid." Rosenfeld v. Glick Real Estate Co., Mo.Sup., 291 S.W.2d 863, 872.

Plaintiff's "point relied on" with reference to the action of the court in granting a new trial on the counterclaim reads as follows: "To make a case in fraud, the evidence must be clear, cogent and convincing and beyond all reasonable doubt; and the trial court erred in sustaining defendants' motion for a new trial because the verdict of the jury on defendants' counterclaim was not against the weight of the evidence nor against the law." In support of that contention plaintiff has cited Rardon v. Davis, Mo.App., 52 S.W.2d 193, which contains a statement that one asserting fraud must prove it beyond a reasonable doubt; Weitzman v. Weitzman, Mo. Sup., 156 S.W.2d 906, wherein it is said that fraud is never presumed but must be proved by clear and convincing evidence; Aslin v. Stoddard County, 341 Mo. 138, 106 S.W.2d 472, which contains a recital of the rule that right rather than wrong action is presumed if presumption may be indulged; Lowther v. Hays, Mo.Sup., 225 S.W.2d 708, which points out that difficulty in proving fraud does not dispense with the necessity of making proof; and Maupin v. Provident Life & Accident Ins. Co., Mo. App., 75 S.W.2d 593, wherein it is stated that failure to prove any one of the essential elements of fraud is fatal to recovery for fraud.

The cases cited by plaintiff contain well-established rules but, to a large extent, have no application here. They deal with fraud accomplished by false representation and matters of that nature. The claim asserted by defendants does not require proof of the various elements of fraud specified in cases of that type. It is founded upon a principal-agent relationship. The rule is based "on the idea of closing the door to the temptation to commit fraud. It tends to keep the agent's eye single and clear to the rights and welfare of his principal. To allow one acting in the fiduciary relation of agent to buy from or sell to himself is a solecism in the realm of law; for the moral stamina of the average man is inadequate to preserving a fine glow of fidelity to his trust and confidential relation in such transaction, and the interdiction is enforced with a strong hand in courts of justice." Meek v. Hurst, 223 Mo. 688, 122 S.W. 1022, 1024.

There is no question about the fact that plaintiff was acting as an employee (agent) of defendants in finding a purchaser and negotiating the sale of the property in question. It is admitted that the property was conveyed to a corporation in which plaintiff owned one half of the stock. Melvin and Jerry Glick each testified that he did not learn of plaintiff's interest in the property until some time after the same was consummated. The evidence recited in this paragraph is sufficient to make a submissible case upon defendants' counterclaim and it therefore follows that the order granting a new trial thereon should be affirmed.

Another contention of plaintiff (that defendants could not maintain the counterclaim because legal title to the land at the time of the sale was in Olivette) appears

for the first time in the argument portion of his brief and is not referred to in the "points relied on." Plaintiff did not cite any authorities in support of that contention and it is not mentioned in defendants' brief. "A point is not properly presented for review if advanced for the first time in the argument." Jones v. Giannola, Mo. App., 252 S.W.2d 660, 663. See also Catanzaro v. Duzer, Mo.App., 329 S.W.2d 257. Under the circumstances we do not deem it advisable to consider that contention. Prior to another trial defendants will have an opportunity to consider this contention and may take such action as they deem advisable in order to eliminate the possibility of error in that connection.

Affirmed and remanded.

COIL and HOUSER, CC., concur.

PER CURIAM.

The foregoing opinion by HOLMAN, C., is adopted as the opinion of the court.

All concur.